Robert W. PFEIL, Sr., as personal representative of the estate of Robert W. Pfeil, Jr., Plaintiff-Appellant,

v.

Robert D. ROGERS, Former District Attorney of Rusk County, et al., Defendants-Appellees.

No. 83–3024.

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1984.

Decided March 8, 1985.

Gerald T. Flynn, Racine, Wis., for plaintiff-appellant. ·

Thomas Terwilliger, Terwilliger, Wakeen, Pichler, Conway & Klingberg, S.C., Wausau, Wis., Gary R. Akavickas, Terwilliger, Wakenn, Piehler, Conway & Klingberg, S.C., Stevens Point, Wis., for defendants-appellees.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge and WYATT, Senior District Judge.*

COFFEY, Circuit Judge.

The plaintiff is the father of Robert W. Pfeil, Jr. who was murdered on August 14, 1979. As personal representative of his son's estate, the plaintiff has alleged that the defendants violated his son's rights under the First and Fourth Amendments, the Equal Protection and Due Process Clauses of the United States Constitution, and 42 U.S.C. ·§§ 1983 and 1985(3) not only in depriving his son of his life but also in the killing of his son's dogs. The district court granted summary judgment for the defendants. We affirm.

I.

At the time of his death, Robert W. Pfeil, Jr. ("Rob") was a 27-year-old student at Mount Senario College in Ladysmith, Wisconsin. Rob lived on his 80-acre wooded tract of land approximately fourteen miles outside Ladysmith, Wisconsin with his three dogs and lion.[1] The three dogs were shot by members of the Rusk County Sheriff's Department on June 12 and 13, 1979 while Rob was on an extended vacation with his father. Rob's death some two months thereafter on August 14, 1979 remains an unsolved murder in Rusk County. The plaintiff father instituted this action in the district court for the Western District of Wisconsin almost three years later on April 27, 1982 against Robert D. Rogers, the former District Attorney for Rusk County, Wisconsin; John Ducommun, a Rusk County deputy sheriff; Vern Sanderson, a former Rusk County deputy sheriff; and Rusk County, Wisconsin. The plaintiff in his complaint alleged that Rogers, Ducommun, and Sanderson were enemies of his son because his son at one time had refused to sell drugs for them and thereafter they conspired with an unknown person to kill his son. The complaint further alleged that the defendants entered his son's property without a warrant and killed his son's dogs, causing him anguish and making him vulnerable to attack without the protection of the dogs. A reading of count I of the plaintiff's complaint reflects that it fails to allege a violation of any constitutional or statutory right of the

---

* The Honorable Inzer B. Wyatt, Senior District Judge of the Southern District of New York, is sitting by designation.

1. Rob donated the lion to a zoo shortly before the incidents that are the subject of this suit occurred.

plaintiff or his son. Rather, it recites the plaintiff's version of how and why his son's dogs were killed and demands damages for "the invasion of the personal and civil rights as above set forth and the resulting anguish, mental strain, grief and fear because of the loss of his dogs and the denial of his companionship with them." The plaintiff also sought punitive damages "because of the willful conspiracy of the defendants and the resultant carrying out of the conspiracy by the Rusk County Sheriff's Department and invasion of the personal and civil rights of Robert W. Pfeil, Jr." Count II of the complaint alleges a completed conspiracy to kill his son in violation of his son's rights to equal protection of the laws, due process, and his son's civil rights as guaranteed by 42 U.S.C. §§ 1983 and 1985. Count III of the complaint[2] alleges that the conspiracy the defendants participated in violated his son's Fourth Amendment right "to be free and secure from unlawful search" and further alleges that the conspiracy violated the "civil and human life and rights of Robert W. Pfeil, Jr. and the Constitution and Laws" by violating Wisconsin statutes relating to criminal trespass,[3] criminal damage to private property,[4] and mistreating animals.[5] The complaint also alleged that the defendants violated a Wisconsin statute[6] "by criminally leaving dead dogs to rot in the heat of the summer sun, which could have caused a plague."

After the parties had engaged in discovery, the defendants filed a motion for summary judgment on May 2, 1983. Relying upon deposition testimony and affidavits, the defendant officers gave the following version of the dogs' deaths: While Rob was on an extended vacation, the dogs' caretaker evidently released them from their pen after Rob left, allowing them to run at large in Josie Creek Park, located adjacent to Rob's property. On June 6, 1979, the dogs were observed by Officer Ducommun near overturned garbage cans in the park and, when Officer Ducommun attempted to right the garbage cans, one of the dogs allegedly attempted to attack him by running at him, growling and barking.[7] Officer Ducommun fired a shot near the dog merely to frighten it away. The officer thereafter consulted with District Attorney Rogers about the dogs' running at large and was advised that "if the dogs were vicious and could not be apprehended, then the dogs should be destroyed." Officer Ducommun stated that he went to Rob's residence on June 12, 1979 to capture the dogs. When asked whether he actually attempted to capture the dogs, Ducommun replied that he was afraid to leave his squad car because the dogs were growling and snapping. After radioing for assistance, Ducommun was joined by Officer Sanderson and Joanne Seija, the Chief of

2. Count III also alleges that the defendants violated Rob's right to a speedy trial. The record reveals that after Rob discovered the bodies of his dogs and learned that they had been shot by members of the Rusk County Sheriff's Department, he assaulted a police officer at the Sheriff's station. The officer he assaulted was not involved in the killing of the dogs. The district court found: "There are no facts in the record regarding a trial of Robert Pfeil, Jr. [on the assault charge] which would implicate [a violation of] his constitutional right to a speedy trial." Our review of the record also failed to disclose any facts supporting a theory of a denial of Rob's right to a speedy trial.

3. Wis.Stat.Ann. § 943.13 (West 1982).

4. Wis.Stat.Ann. § 943.01 (West 1982).

5. Wis.Stat.Ann. § 948.02 (West 1982).

6. The plaintiff lists this statute as "§ 59.50(3)." However, Wis.Stat.Ann. § 59.50 concerns the register of deeds' deputies and has no relation to "criminally leaving dead dogs to rot in the heat of the summer sun, which could have caused a plague." The plaintiff apparently refers to Wis. Stat.Ann. § 95.50(3) which provides in pertinent part:

"(3) Any dead animal found upon a public highway or other public place shall, in case the owner of such animal cannot be found, be buried or otherwise disposed of at public expense by the proper health officer of the town, city or village wherein such animal is found."

7. The record contains a picture of two Great Danes taken by Officer Ducommun before he exited his squad car to pick up the garbage cans in Josie Creek Park.

Police for Hawkins, Wisconsin.[8] According to the depositions, Rusk County did not at that time have a dogcatcher. At Officer Seija's insistence, the officers had the police radio dispatcher contact District Attorney Rogers to confirm his instructions that they should destroy the dogs if the dogs were vicious and they were unable to capture them. The officers killed one Great Dane on Rob's property on June 12th, but made no attempt to properly dispose of the dog's body. The other dogs fled into nearby woods. On the next day Ducommun returned to Rob's property and discovered that the other Great Dane and the mongrel had returned. Ducommun called the dogs but they would not come to him. He radioed for assistance and was joined by Officer Sanderson. Ducommun discovered the Great Dane in its doghouse and shot it while it was in the doghouse. Ducommun shot it twice again as it tried to leave the doghouse and, after waiting about 15 seconds, fired a final round into the animal's head. Sanderson mortally wounded the mongrel as it fled into the woods. And once more the officers did not dispose of the dogs' remains but allowed them to rot and decay in the summer sun. In their motion for summary judgment, the defendants submitted an affidavit reciting that, even though the dogs were required to be licensed by Wisconsin law, they were not licensed. Finally, as to Rob's death, the defendants submitted the affidavit of one William E. Volkman, the Sheriff of Rusk County, Wisconsin, stating that, although there was an on-going investigation of Rob's death, "[a]s of the date of this affidavit, the alleged murderer is presently at large and the enforcement authorities have reported no suspects in the murder."

The plaintiff's response to the summary judgment motion attempted to attack the defendants' legal justification for shooting the dogs by disputing whether the dogs in the park were Rob's dogs, by trying to establish that Rob's dogs were gentle rather than vicious, and establishing that the officers did not attempt to capture the dogs before destroying them.

To support his allegation that the defendants murdered his son, the plaintiff submitted the affidavits of two persons, Gene and Melody Anderson, stating that one Betty Zajec, a neighbor of Rob's, witnessed his murder. According to the affidavits, Zajec said an unknown person shot Rob in the back of the head. Zajec allegedly told the Andersons that immediately after the shot was fired, District Attorney Rogers, and Officers Ducommun, and Sanderson emerged from the bushes from which the killer had exited. The plaintiff also submitted a letter from Thomas Lynn, an inmate in the state prison at Waupun, Wisconsin to Pfeil, Sr. Lynn alleged that one Michael Thompson told him that Sanderson had killed two Great Danes and had offered him $2,000 to kill "someone in northern Wisconsin."

Although the district court had warned the parties that it would not consider any briefs, affidavits, or other documents submitted after the filing of the defendants' reply brief on the motion for summary judgment, the plaintiff, contrary to the court's order, did submit several affidavits and briefs after the filing deadline. An affidavit by Pfeil, Sr., affidavits by Betty Zajec's family members, and affidavits by the Andersons were among the documents filed after the deadline and were submitted in support of a "Motion and Memoranda for Extension of Time to File Affidavits Pursuant to Rules 59(c) and 60(b)." In his affidavit, Pfeil, Sr. stated that "the Affidavits of the [Zajec] family members contains [sic] information that is entirely newly discovered evidence, and of which the plaintiff, until August 10, 1983, had no knowledge thereof." Pfeil, Sr. alleged that on that day he "accidentally ran into a neighbor of said family [the Zajecs] ... who advised him of the fact that said information was available and where the parties who had said information could be contacted." The affidavits of the Andersons and

---

8. The record discloses that Seija and the City of Hawkins originally were named as defendants but later were dropped from the suit without explanation.

the family members relate the events surrounding the death of Betty Zajec and state that Betty Zajec was threatened after she witnessed Rob's murder. In response, Mrs. Zajec "became fearful, introverted and withdrawn and ... was on the verge of mental collapse because of the stress and strain brought on by said experiences." When contacted by the Department of Criminal Investigation on May 15, 1980, Mrs. Zajec was fearful of making a statement about Rob's murder. She asked the investigators to leave the room while she spoke with her family. Mrs. Zajec "became extremely agitated and disoriented and excited, and again told [her daughter] and her sisters, who were there in the kitchen, that everything that she had told them relative to her seeing Robert Pfeil, Jr. murdered and identifying the persons who were present at the scene was true." Mrs. Zajec expressed fear that the murderers would take revenge on her and her family were she to give a statement. She exclaimed, "I'm damned if I do and damned if I don't," stepped into the next room and took her life with a gun.

In granting the motion for summary judgment, the district court made several procedural rulings. The court refused to consider any materials submitted after the filing of the defendants' reply brief "[i]n the interests of expediting my decision on the summary judgment motion." Further, the court refused to consider the affidavits of Gene and Melody Anderson and Robert W. Pfeil, Sr. submitted before the deadline because they were "uncertified." Similarly, the district court refused to consider excerpts of depositions contained in the affidavits because the excerpts were not "certified as complete and authentic transcripts." The court also ordered deleted evidence in the plaintiff's material that "fail[ed] to meet" the requirements of Fed. R.Civ.P. 56(e) that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." After the hearsay, legal argument and opinion were deleted from the plaintiff's material, the court found that the plaintiff had established that: (1) on earlier occasions, the dogs had been gentle and kind in the presence of two persons; (2) one person saw the deceased, Rob, give money to an unnamed representative of Rusk County;[9] and (3) a professor at Mount Senario College had on one occasion interceded in a verbal argument between District Attorney Rogers and Rob.

The district court accepted the defendants' version of the facts offered with their motion for summary judgment finding, "no concrete evidence of a conspiracy to harm Robert or his dogs in violation of Robert's constitutional rights." The court dismissed the equal protection, due process, and §§ 1983 and 1985 claims dealing with the defendant officers' alleged involvement in Rob's death because "there is simply nothing in the record that indicates that the defendants had anything to do with Robert's death." Moreover, the court granted summary judgment dismissing the plaintiff's claims concerning the destruction of the dogs because "where plaintiff does not submit facts supporting plaintiff's conspiracy claims, and defendants submit sworn affidavits that they acted non-conspiratorially and in good faith, there are not really conflicting inferences to be drawn.... [Thus], summary judgment is appropriate."

Further, the court ruled that District Attorney Rogers' act of giving legal advice to the officers in response to their inquiry concerning their authority to destroy Rob's dogs if the dogs were vicious and the officers were unable to capture them was "cloaked with absolute prosecutorial immunity." The court also held that the defendants were entitled to the "defense of qualified immunity for acting in good faith" because "in 1979, Wisconsin law provided that unlicensed dogs were to be impounded, and that sheriff's deputies were authorized

---

**9.** A review of the deleted hearsay portions of this affidavit reveals that the plaintiff was trying to establish that Rob had in fact paid the license fees for his dogs.

to enter the premises of the owner to seize the dogs," Wis.Stat. § 174.10(1) (1974), and further provided that, "any person may kill any dog ... that may suddenly assault him while he is peacefully walking or riding and while being out of the inclosure of its owner or keeper...." Wis.Stat. § 174.01 (1974). "Given the size of the dogs, their attacks on Ducommun, and their presence in a public park," the court ruled that the officers' belief in the necessity of destroying the dogs was not "objectively unreasonable." The judge found no "evidence of any sort in the record that lends itself to the inference of a conspiracy to kill the dogs out of malice." Based on this evidence, the court held that the officers had acted in accordance with Wisconsin law and granted summary judgment in favor of the defendants on the issue of whether they acted in good faith when they entered Rob's property to attempt to capture the dogs and in killing the dogs when they were unable to capture them.

This appeal raises five issues: (1) whether the district court abused its discretion when it denied the continuance of the summary judgment proceedings; (2) whether, during a summary judgment proceeding, a district court may disregard materials submitted after its filing deadline; (3) whether an affidavit lacking only a notary seal is improper under Fed.R.Civ.P. 56(e); (4) whether the evidence disregarded by the district court failed to comply with Fed.R.Civ.P. 56(e); and (5) whether there is a genuine issue as to any material fact which would prevent granting summary judgment.

## II.

**A. The Motion for a Continuance and the Post-Deadline Submissions.**

■ Fed.R.Civ.P. 56(f) provides:

"Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposi-

tion, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

"[T]he law is clear that in order to obtain a continuance for further discovery or any other dispensation from the requirements of Rule 56(e), the opposing party must state in an affidavit the reasons for its inability to present an affidavit on personal knowledge." *Moon v. Central Intelligence Agency*, 514 F.Supp. 836, 840 (S.D.N.Y.1981) (citations omitted). A court may disregard a failure to formally comply with Rule 56(f) if the opposing party's request for a continuance clearly sets out the justification for the continuance. *See, e.g., Littlejohn v. Shell Oil Co.*, 483 F.2d 1140 (5th Cir.), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973). The plaintiff attempted to justify his application for a continuance by alleging that discovering the existence of members of Betty Zajec's family was at least difficult. The plaintiff complied with the requirements of Rule 56(f) by reciting his justification for the continuance in the affidavit of Robert W. Pfeil, Sr. even though he labeled his motion for a continuance as a "Motion and Memoranda for Extension of Time to File Affidavits Pursuant to Rules 59(c) and 60(b)."[10]

■ Because the plaintiff complied with the affidavit requirement of Rule 56(f), the issue is whether the district court abused its discretion in denying the continuance. Absent an abuse of discretion, the trial court's determination of whether a continuance is justified will not be interfered with by an appellate court. *Harris v. Pate*, 440 F.2d 315, 318 (7th Cir.1971); *see also Cohen v. Ayers*, 596 F.2d 733, 743 n. 20 (7th Cir.1979). The justification for a continuance of a motion for summary judgment proceeding "must be genuine and convincing to the court rather than merely colorable." *Robin Construction Co. v.*

---

**10.** This document lacks a notarial seal. As will be more fully discussed below, this technical defect could have been corrected by merely allowing the plaintiff an opportunity to furnish the court with a properly notarized affidavit.

*United States,* 345 F.2d 610, 614 (3d Cir. 1965). In his affidavit, the plaintiff asserts that he was unable to submit the affidavits of the Zajec family members because he did not learn of the existence of the family members from a neighbor until August 10, 1983, approximately two months after the deadline for filing supporting affidavits. However, the affidavits of Gene and Melody Anderson submitted as part of the plaintiff's response to the defendants' motion for summary judgment were dated November 19, 1982. The Andersons were friends of Betty Zajec and in fact Gene Anderson was present in her home when she committed suicide. The plaintiff would have us believe that he failed to ask Anderson whether anyone else was present in the Zajec home when Betty Zajec committed suicide, but that he happened to learn from a Zajec neighbor *some ten months later* that Betty Zajec's relatives were at her home when she committed suicide. It strains credibility to argue that a person investigating a notorious murder, such as Rob's, in a small town like Ladysmith, Wisconsin where both Rob's and Zajec's deaths would be well publicized, would fail to ask a person who was in the house where the only witness to the murder committed suicide the simple question "Was anyone else at Betty Zajec's house when she committed suicide?" Furthermore, in view of the fact that Zajec committed suicide at the very time officers of the Wisconsin Division of Criminal Investigation were in the next room waiting to continue their interrogation of her knowledge of Rob's murder, we fail to understand why the plaintiff did not attempt to interview the officers to obtain the names of the other witnesses contained in their official report. Although the plaintiff may not have been aware of the names of the persons who were at the Zajec home at the time of her death, he failed to establish in the court record that he had exercised reasonable diligence in his attempt to ascertain the existence of the Zajec family members in a timely fashion. We will not overturn the judgment of the court or find an abuse of discretion by the court in its refusal to grant a continuance because we are convinced the plaintiff should have been able to obtain the names with due diligence if he had asked Gene Anderson if anyone else was present at the time Zajec committed suicide. When a party fails to secure discoverable evidence due to his own lack of diligence, it is not an abuse of discretion for the trial court to refuse to grant a continuance to obtain such information. *Reeg v. Shaughnessy,* 570 F.2d 309, 316 (10th Cir.1978). We hold that the district court's denial of the motion for a continuance of the summary judgment proceedings was proper and not an abuse of discretion.

We now turn to the issue of whether the district court could disregard other affidavits and briefs submitted by the plaintiff after the previously announced filing deadline and not submitted as part of the motion for a continuance. Rule 56(c) provides that affidavits in opposition to a motion for summary judgment must be served on the moving party prior to the day of the hearing. Exercising their power under Rule 83,[11] several judicial districts have adopted local rules requiring the opposing party to file opposing affidavits and briefs within a specified time period between the service of the summary judgment motion and the date set for the hearing. 10A Wright, Miller & Kane, Federal Practice and Procedure § 2719, at 12–13 (1983). "The purpose of these local rules is to provide a specific time within which the opposing party must respond to the motion and to make certain that the issues on the motion are properly framed." *Id.* at 13. The local rules of the Western District of Wisconsin, which as the court's opinion pointedly notes were provided to both parties, specify that the affidavits and other materials of the opposing party shall be filed "on or before the schedule issued by the court." Requiring strict compliance

---

**11.** Fed.R.Civ.P. 83 provides in pertinent part: "Each district court ... may ... make and amend rules governing its practice not inconsistent with these rules."

with the local summary judgment rule—specifying that all material must be filed in accordance with the district court's scheduling order—furthers the purpose of properly framing the issues in allowing the moving party to respond to all of the resisting party's arguments in its reply brief as well as allowing the trial court to organize and control its calendar in an orderly manner. The filing deadline therefore assures the court not only that its decisions will be accurate because the issues will have been fully briefed and argued but also that summary judgment motions will be heard in a timely fashion. In her order granting the summary judgment motion in favor of defendants, the district court judge specifically noted, "I informed counsel by letter that I would not consider any briefs, affidavits, or other documents submitted after Defendants' reply brief on their summary judgment motion." Thus, there can be no doubt that the plaintiff was aware that he had to submit all of his evidence and argument to the district court before the filing deadline. The record reveals that the plaintiff submitted several documents after the filing deadline of June 14, 1983; specifically, he filed documents on July 19, 1983, July 27, 1983 and August 23, 1983.[12] The documents submitted on August 23 were offered in support of the motion for a continuance. Examination of the documents submitted on July 19 and 27th reveals that the documents attempted to reply to the arguments presented in the defendant's reply brief and were offered because "[t]he plaintiff [felt] impelled to answer certain of defendants' statements contained in [the defendants' motion for summary judgment, reply brief, and motion to strike the plaintiff's affidavits [13]] all of which collectively constitute the defendants' Brief in Opposition to Plaintiff's Material in Opposition to Defendant's Motion for Summary Judgment." That the plaintiff felt "impelled to answer certain of defendants' statements" fails to state a sufficient reason for ignoring the district court's admonition that all of the plaintiff's evidence and argument on the summary judgment motion must be submitted before the defendants' reply brief. Moreover, if the district court had considered the July 19th and 27th documents, to be fair it would have had to give the defendants an opportunity to respond and thus prolong the court's decision on the summary judgment motion. Because no colorable reason was given to explain the plaintiff's failure to file his documents before the deadline, the district court was not compelled to delay the proceeding by considering the late documents and allowing the defendants to respond. The decision to disregard all material submitted after a reasonable filing deadline is certainly not an abuse of discretion because it allowed the district court to preserve the moving party's right to respond to the resisting party's arguments and to decide the summary judgment motion in a timely fashion. We approve the court's ruling on this issue.

## B. Failure to apply Notarial Seal and Rule 56(e) Defects.

 Finding that the affidavits of Pfeil, Sr. and the Andersons, were "uncertified," the court refused to consider these affidavits as part of the plaintiff's opposition to the motion for summary judgment. The Anderson affidavits [14] recite that "[The affiant], being first duly sworn on oath deposes and states...." The affidavits were signed by the affiant and bore the following jurat: "Subscribed and sworn to before me this 19th day of November, 1982. Gerald T. Flynn. Notary Public, Racine County, Wis. My commission is

---

12. According to the Docket Sheet, the plaintiff filed ten documents on July 19, 1983, three documents on July 27, 1983, and five documents on August 23, 1983.

13. The district court considered the plaintiff's "brief in opposition to defendants' motion to strike."

14. The Pfeil, Sr. affidavit differs only in that it does not begin "[The affiant] being first duly sworn on oath deposes and states...." However, since the jurat states that it was sworn to before the notary, we hold that it complies with 28 U.S.C. § 1746 and is legally indistinguishable from the Anderson affidavits.

permanent." The papers, however, were not embossed with the notary's seal. Fed. R.Civ.P. 56(e) requires that, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." "An affidavit is a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath." *Farm Bureau Mut. Auto Ins. Co. v. Hammer,* 83 F.Supp. 383, 386 (W.D.Va.), *rev'd. on other grounds,* 177 F.2d 793 (4th Cir.1949), *cert. denied,* 339 U.S. 914, 70 S.Ct. 575, 94 L.Ed. 1339 (1950); *see also Egger v. Phillips,* 710 F.2d 292, 311 n. 19 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). Affidavits are admissible in summary judgment proceedings if they are made under penalties of perjury; only unsworn documents purporting to be affidavits may be rejected. 28 U.S.C.A. § 1746 (West Supp.1984);[15] *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 n. 16, 90 S.Ct. 1598, 1608 n. 16, 26 L.Ed.2d 142 (1970). "[T]he absence of the formal requirements of a jurat in ... sworn affidavits [does] not invalidate the statements or render them inadmissible [if] they were actually sworn to before an officer authorized to administer an oath." *Peters v. United States,* 408 F.2d 719, 722, 187 Ct.Cl. 63 (1969); *accord Dickinson v. Wainwright,* 626 F.2d 1184 (5th Cir.1980) (per curiam). The Pfeil and Anderson affidavits were sworn to before an officer, a notary public, one authorized to administer an oath. Following the clearly recognized rule that "the absence of the formal requirements of a jurat in a sworn affidavit does not invalidate the statements or render them inadmissible if they were actually sworn to before an officer authorized to administer an oath," *Peters,* 408 F.2d at 722, we conclude that so long as the documents comply with 28 U.S.C. § 1746, and in the interests of justice, a district court should not be unnecessarily hypertechnical and overly harsh on a party who unintentionally fails to make certain that all technical, non-substantive requirements of execution are satisfied. We hold that the district court erred in disallowing the Pfeil and Anderson affidavits for lack of a notarial seal in view of the fact that the documents complied with the 28 U.S.C. § 1746 requirement that they be made under penalty of perjury.

Similarly, the district court refused to consider excerpts of depositions contained in the affidavits because the excerpts were not "certified as complete and authentic transcripts." Fed.R.Civ.P. 56(e) requires that, "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions...." An unsworn statement does not meet the requirements of Rule 56(e). *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159 n. 19, 90 S.Ct. 1598, 1609 n. 19, 26 L.Ed.2d 142 (1970). The plaintiff supplemented the affidavits with excerpts from depositions filed with the district

**15.** 28 U.S.C. § 1746. provides as follows:

"§ 1746. *Unsworn declarations under penalty of perjury*

"Whenever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

\* \* \* \* \* \*

"(2) If executed within the United States, its territories, possessions, or commonwealths: 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)'."

court. Examination of the affidavits reveals that each affiant swore that the questions and answers were excerpted from the depositions. Furthermore, certified copies of the complete depositions were filed with the district court. The certification of the depositions fulfilled the Rule 56(e) requirement that supporting material be certified. Furthermore, Rule 56(e) specifically allows affidavits to be supplemented by depositions. We fail to understand why the district court refused to consider the deposition excerpts contained in the affidavits since the affidavits were sworn statements of recited testimony excerpted from certified depositions that had been filed with the district court and complied with the Rule 56(e) requirement that "certified copies of all papers ... referred to in an affidavit shall be ... served therewith."

We now turn to the issue of whether the opposing affidavits that were timely filed qualified under Rule 56(e) requiring that the affidavit: (1) must be made on personal knowledge of the affiant; (2) set forth facts that would be admissible in evidence; and (3) show affirmatively that the affiant is competent to testify to the matters stated therein. "[T]he policy of Rule 56(e) is to allow the affidavit to contain all evidentiary matter, which, if the affiant were in court and testifying on the witness stand, would be admissible as part of his testimony." 6 Moore's Federal Practice, § 56.22[1] at 1321–22 (1982). "[H]earsay statements that would be admissible at the trial as exceptions to the hearsay rule may be contained in the affidavit...." *Id.*

at 1322. Initially, we examine the question of whether the Anderson affidavits submitted before the deadline contained inadmissible hearsay. The Anderson affidavits relate Betty Zajec's version of Rob's murder[16] and were offered to prove that District Attorney Rogers, and Officers Ducommun and Sanderson participated in the conspiracy to murder Rob. The plaintiff argues that Mrs. Zajec's statements are admissible hearsay because they are: statements against interest under Fed.R.Evid. 804(b)(3); a present sense impression under Fed.R.Evid. 803(1); an excited utterance under Fed.R.Evid. 803(2); and a dying declaration under Fed.R.Evid. 804(b)(2). Fed. R.Evid. 804(b)(3) provides in pertinent part that a statement is admissible if it:

"... was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true."

The plaintiff argues that because Betty Zajec's failure to disclose to law enforcement officials that she had witnessed Rob's murder violated Wis.Stats. § 946.41; § 946.47 and § 946.65, her statement to the Andersons that she witnessed Rob's murder was a statement against her penal interest. Wis.Stat. § 946.41(1)[17] provides that any person who "... knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor." The word "ob-

**16.** Gene Anderson's affidavit recites in pertinent part:

"On at least two of the occasions when I did not participate in the discussions, I heard Mrs. Zajec repeat the whole story of how she happened upon the murder just as the shot was being fired into Robert Pfeil Jr.'s head. I heard her tell my wife that the first two men to come from the ground into the light so that they could be seen was deputy sheriff Sanderson and an unknown assailant. She stated that the unknown assailant fired the bullet that killed Robert Pfeil, Jr. She stated that immediately two other men came from the ground and could plainly be seen by her and she told my wife that these two men were

deputy Ducommun and District Attorney Rogers of Rusk County. I heard her tell my wife how she turned and ran to her car and got out of there. She also told my wife that she was receiving threatening phone calls some of which were local and some of which were from other places and that she was being ordered to leave the area on the threat that her daughters would be killed one by one if she did not. Mrs. Zajec further explained to my wife that she had now lived with this information and this fear for over a year and that with the phone calls coming in, it was getting unbearable for her to endure."

**17.** Wis.Stat. § 946.41 was amended in 1984.

structs" is defined as "includ[ing] without limitation knowingly giving false information to the officer with intent to mislead him in the performance of his duty including the service of any summons or civil process." *Id.* (2)(b). Wis.Stat. § 946.47(1) provides that any person who either "[w]ith intent to prevent the apprehension of a felon, harbors or aids him; or [w]ith intent to prevent the apprehension, prosecution or conviction of a felon, destroys, alters, hides or disguises physical evidence or places false evidence" commits a Class E felony. Finally, Wis.Stat. § 946.65(1) provides that "[w]hoever for a consideration knowingly gives false information to any officer of any court with intent to influence the officer in the performance of official functions is guilty of a Class E felony." "Officer of any court" includes "the judge, reporter, bailiff and district attorney." *Id.* (2). None of these statutes specify that a person commits a criminal act merely by failing to disclose that another person has committed a felony. Furthermore, the plaintiff has failed to cite any case law in support of his theory that a person commits a criminal act by failing to disclose his knowledge that another person has committed a felony. The record fails to reveal that Betty Zajec made a statement at any time to an officer, much less a false or misleading statement. The record is silent in reference to Betty Zajec destroying, altering, hiding or disguising physical evidence; nor harboring or aiding a felon with the intent to prevent his apprehension; nor making a false statement to an officer of a Wisconsin court. Because Mrs. Zajec did not commit an affirmative act to conceal the crime such as making a false statement to a law enforcement officer, we fail to understand how her statements to the Andersons could be considered statements against her penal interest.

Furthermore, both the present sense impression and excited utterance exceptions require that the statement be made contemporaneously with the event that prompted them. Because Mrs. Zajec's statements to the Andersons were not made contemporaneously with the shooting of Rob but were in fact made after a substantial period of time, the present sense impression and excited utterance exceptions to the hearsay rule are inapplicable. Finally, none of the statements recited in the timely submitted Anderson affidavits were made on the day Mrs. Zajec committed suicide; rather, the affidavits relate to conversations that took place some period of time before her death but sometime after Rob's demise. Neither Gene nor Melody Anderson were with Mrs. Zajec immediately prior to her suicide when she told her family that "everything that she had told them relative to her seeing Robert Pfeil, Jr. murdered and identifying the persons who were present at the scene was true." Because the statements to the Andersons were not made in contemplation of death, the dying declaration exception to the hearsay rule is inapplicable.[18] Since there is no applicable exception to the hearsay rule, the Andersons' recitations of Mrs. Zajec's descriptions of Rob's murder may not be considered in ruling on the motion for summary judgment.

Furthermore, we must examine the affidavit of Pfeil, Sr., improperly deleted by the district court as being "uncertified," and the other affidavits submitted by the plaintiff to resist the summary judgment motion to determine whether they meet the Rule 56(e) requirement that the evidence be admissible. The affidavit of Pfeil, Sr. contains excerpts of Officer Ducommun's deposition testimony that although he did not know that the dogs were

---

18. The statement "everything that she had told them relative to her seeing Robert Pfeil, Jr. murdered and identifying the persons who were present was true" was made in affidavits that were submitted after the filing deadline. As we discussed above, the district court correctly refused to consider these affidavits because they were not submitted before the filing deadline.

Thus, the statements made immediately prior to Mrs. Zajec's suicide are not part of the record because the plaintiff did not submit the statements before the filing deadline. We express no opinion on whether statements made immediately prior to a suicide may be admitted under the dying declaration exception to the hearsay rule.

Rob's when he first encountered them in Josie Creek Park, he learned from the radio dispatcher that the dogs might belong to Rob. In addition, the affidavit contains excerpts of Officer Sanderson's testimony that he did not attempt to capture the dogs, and that, while he believed he might be trespassing, he entered Rob's property without a warrant. The affidavit also excerpted the deposition testimony of Judith Baxter, Rogers' secretary, who relayed the advice from Rogers to the police radio dispatcher. Finally, the affidavit asserts that Rogers' advice incorrectly stated Wisconsin law and concludes that Rogers conspired to illegally destroy the dogs. Rule 56(e) specifies that "[s]upporting and opposing affidavits shall be made on personal knowledge, *shall* set forth such *facts* as would be *admissible* in *evidence,* and *shall* show affirmatively that the *affiant* is *competent* to testify to the matters stated therein." (Emphasis added). Because legal argumentation is an expression of legal opinion and is not a recitation of a "fact" to which an affiant is competent to testify, legal argument in an affidavit may be disregarded. *See Universal Film Exchanges, Inc. v. Walter Reade, Inc.,* 37 F.R.D. 4 (S.D.N.Y.1965). The plaintiff's argument that Rogers' advice was incorrect is legal argument and may not be considered as a recitation of fact to which the affiant was competent to testify; thus it may be disregarded. Furthermore, because the plaintiff's conclusion that Rogers conspired to illegally destroy the dogs is nothing more than unsupported suspicion and argumen-

tation without foundation in the record, it likewise is without merit. However, our review of the deposition testimony of Ducommun, Baxter, and Sanderson recited in the affidavit reveals that this evidence conveyed three facts admissible in evidence: (1) Ducommun learned from the police radio dispatcher that the dogs might belong to Rob;[19] (2) Sanderson, who was called to Rob's property by Ducommun on both June 12, when Ducommun allegedly was afraid to leave his squad car because the dogs growled and snapped at him, and June 13, after Ducommun allegedly attempted to capture the dogs, did not personally attempt to capture the dogs. He further stated that he did not observe an attempt to capture the dogs. Although Sanderson in fact had misgivings about entering Rob's property without a warrant, he entered the property without obtaining a warrant; and (3) Rogers' secretary relayed the district attorney's advice to the police radio dispatcher. Because these facts were properly admissible in evidence, we hold they must be considered when determining whether the motion for summary judgment was properly granted.

In addition, the district court excluded from evidence the affidavits of William Dusselmann, Karen Nelson, Robert W. Pfeil, Sr., and Buck Anderson on the grounds the statements were inadmissible hearsay, were not based on personal knowledge, violated the best evidence rule (Fed. R.Evid. 1002), or were legal argument.[20] Our review of the record reveals that the

---

**19.** The district court found that the statement was offered to explain Ducommun's subsequent actions. The district court concluded that this statement was not hearsay because it was not offered for the truth of the matter asserted therein.

**20.** The deleted evidence was offered to prove, *inter alia:* (1) there was animosity between Rob and District Attorney Rogers; (2) Rob's dogs held their tails high while the dogs photographed by Ducommun held their tails low to the ground; (3) Rob telephoned the dogs' caretaker daily during his vacation and she told Rob that the dogs were "well and healthy, and in their cage"; (4) one Cecil Lyon told an investigator, who recited the statement in his affidavit, that he was the Rusk County dogcatcher at the

time the dogs were killed and was not asked to apprehend the dogs. The investigator's statement was inadmissible hearsay because it was offered to prove the truth of the matter asserted—that Lyons was the Rusk County dogcatcher at the time the dogs were killed—and may not be considered when ruling on a motion for summary judgment. Fed.R.Civ.P. 56(e). Furthermore, the defendants submitted an affidavit of Cecil Lyons stating that he was *not* the Rusk County dogcatcher at the time the dogs were killed. Because Lyon's affidavit cannot be controverted by the inadmissible hearsay in the investigator's affidavit, we conclude that Rusk County did not in fact employ a dogcatcher on the date the dogs were killed.

materials deleted from the plaintiff's affidavits were replete with such material. We hold that the district court's deletion of inadmissible hearsay, speculation and unsupported argumentation from the affidavits of Dusselmann, Nelson, Pfeil, and Buck Anderson for failing to comply with the Rule 56(e) requirement that the evidence be admissible at trial was proper.

### C. Whether Summary Judgment Should Have Been Granted.

This court recently set forth the standard of review for a case decided on summary judgment:

"In reviewing a summary judgment, an appellate court must view the entire record and the inferences drawn therefrom in the light most favorable to the party opposing the motion. If a study of the record reveals that inferences contrary to those drawn by the trial court might be permissible, then the summary judgment should be reversed. Finally, although summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of his position."

*Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985) (citations omitted).

Applying this standard to the present case, we initially note that the district court found that the defendants established that Rob's dogs were unlicensed and had been roaming away from their owner's premises while loose in Josie Creek Park. Moreover, the defendants presented evidence to prove that the dogs had attempted to attack Officer Ducommun on two occasions by barking and snapping at him both when he encountered them in the park and when he encountered them on Rob's property. The defendants also established that as of the date of the summary judgment hearing the local law enforcement authorities did not have a suspect for Rob's murder. According to the district court, the plaintiff estab-

lished that: (1) the dogs had been gentle in the presence of two persons on previous occasions; (2) Rob gave money to a county representative; and (3) a Mount Senario professor on one occasion interceded in a verbal argument between Rob and Rogers. Our review of the evidence and the court's rulings reveal that the plaintiff established three additional facts: (1) Ducommun learned from the police radio dispatcher that the dogs might belong to Rob; (2) Sanderson, who was called to Rob's property by Ducommun on both June 12th, when Ducommun allegedly was afraid to leave his squad car because the dogs growled and snapped at him, and June 13, after Ducommun allegedly attempted to capture the dogs, did not personally attempt to capture or restrain the dogs. He further stated that he did not observe an attempt to capture the dogs. Although Sanderson in fact did have misgivings about whether it was proper to enter Rob's property without a warrant, he entered the property without obtaining a warrant; and (3) Rogers' secretary rather than the district attorney himself relayed the advice to the police radio dispatcher.

■■■ The district court found, and we agree, that "there is absolutely no evidence of any sort linking the defendants to Robert's death" on August 14, 1979. Because the plaintiff failed to establish an issue of fact concerning a "conspiracy" by the defendants to kill Rob to be tried, we hold the district court's action in dismissing Count II of the complaint was proper.

■■■ We now turn to the question of whether there exists a material issue of fact that Rob's Fourth Amendment rights were violated. The plaintiff argues that "the dogs were killed for personal reasons of the defending parties who entered the private land, without a search warrant and killed the dogs without knowing whether they had ever been off the property or not, and who then tried to cover up said act by alleging that he was killing the dogs for the protection of the public, in his official capacity as deputy sheriff; that the District Attorney

authorized the killing of the dogs, and that their arrangement was actually a conspiracy between Ducommun and Rogers to kill the dogs of Robert Pfeil, Jr. in an illegal manner and to attempt to make it appear that the dogs were being killed legally, or for just cause."

Thus, the plaintiff's theory is that, because the dogs were licensed and gentle and had not left Rob's property, the defendants' entry was not authorized by Wisconsin law. The plaintiff concludes that because the defendants' entry onto Rob's property was not authorized by Wisconsin law, they should have obtained a warrant before entering. The determinative issue, therefore, is whether the defendants' entry was justified under Wisconsin law.

In 1979, Wisconsin law enforcement officers were not required to obtain a warrant to enter private property to seize an unlicensed dog:

> "The fact that a dog is without a license attached to a collar shall be presumptive evidence that the dog is unlicensed. No action shall be maintained for an injury to or the destruction of a dog without a tag, unless it appears affirmatively that the dog is duly licensed and that a tag had been properly attached to the collar of the dog or had been lost or removed without the knowledge or consent of the owner, or that the dog is not required to be licensed. The sheriff and his deputies, any marshal or constable or other police officer, any humane officer of a duly authorized humane society shall seize, impound or restrain any dog for the keeping of which no license has been issued and for which one is required or seize, impound or restrain any dog found running at large *and any such officer may enter the premises of the owner to seize such dog.*"

Wis.Stat.Ann. § 174.10(1) (1974) (emphasis added).[21] Specifically, the defendants' entry on Rob's property to seize the unlicensed dogs was authorized under Wisconsin law if the dogs were not licensed and had been observed running at large.

The defendants submitted affidavits establishing that the dogs were seen off the premises of their owner in Josie Creek Park on June 4 by campers and Officer Ducommun. Ducommun, after radioing to headquarters, was advised by the police radio dispatcher that the dogs might belong to Rob Pfeil. Ducommun went to Rob's residence, found the dog cages unoccupied, and noted that the dogs were not on the premises. On June 6, Ducommun again encountered the dogs in Josie Creek Park next to overturned trash cans. When Ducommun left his squad car to right one of the overturned trash cans, the mongrel dog ran towards him, growling and barking, forcing Ducommun to shoot in the area of its feet to frighten it away. On that day, Ducommun contacted District Attorney Rogers and was advised that, under Wisconsin law, if the dogs were vicious and could not be captured, they should be destroyed. Ducommun stated that on June 12 he went to Rob's residence to catch the dogs. However, Ducommun stated he initially was unable to get out of his squad car because the dogs were growling and snapping at him. After Ducommun radioed for assistance for help in killing the dogs he was joined by Officers Sanderson and Seija. He asked the police radio dispatcher to contact Rogers again for advice. Rogers reiterated his earlier opinion that, if the dogs were "vicious and could not be apprehended, they should be destroyed." The record reveals the officers made no attempt to capture the dogs on June 12. One Great Dane was killed that day. On June 13, Ducommun returned to Rob's property. Ducommun stated that he called the dogs but they would not come to him. Ducommun radioed for assistance and was joined by Sanderson. Officers Ducommun and Sanderson killed the other Great Dane and fatally wounded the mongrel.

The plaintiff disputes the district court's findings that the dogs were unlicensed, that they were in Josie Creek Park, and

21. Section 174.10(1) was repealed January 1, 1981.

that the dogs were vicious. The plaintiff, who failed to introduce any type of official document or certificate demonstrating that the dogs were in fact licensed, did attempt to establish that the dogs were licensed through the affidavit of one Karen Nelson. In her affidavit, Nelson alleged that she overheard "a representative of Rusk County" ask Rob how many dogs he owned and "at said time and place she saw Robert W. Pfeil, Jr. take money from his pocket and give it to the representative of Rusk County in payment of the license fees for said dogs." After examining the wording of this affidavit and after deleting the hearsay therefrom, the only points established are that there was a discussion about how many dogs Rob owned and that Nelson saw Rob give money to an unnamed county representative. On the other hand, the defendants submitted the affidavit of the Rusk County Clerk, Richard Sargent, the person responsible for "maintaining all monthly reports of dog licenses made to the County Clerk and the County Clerk's records of dogs within the county," stating that Rob's dogs were not licensed. Nelson's statement that she saw Rob give money to an unnamed county representative is insufficient to rebut the independent evidence elicited from Sargent that after he had examined the official county license file he ascertained there was no record of Rob's dogs being licensed. The plaintiff likewise misconstrues the deposition testimony of Officer Ducommun that he did not know whom the dogs belonged to when he saw them for the first time in Josie Creek Park as meaning that Rob's dogs were not in the park. However, Officer Ducommun stated in his affidavit and in his deposition that the dogs he saw running at Josie Creek Park were the same dogs he killed at Rob's residence. Ducommun's statement that he did not know that the dogs he initially saw were Rob's does not contradict or cast doubt upon his subsequent statement that the dogs he killed were the same dogs he saw running at large in Josie Creek Park. To prove that the dogs were not vicious, the plaintiff offered evidence that the dogs had been gentle on previous occasions in the presence of other persons. However, there is uncontroverted evidence that the dogs on June 6, 1979 chased Officer Ducommun in Josie Creek Park and Ducommun stated that on this occasion he was forced to shoot at one dog before retreating into his squad car. Moreover, the dogs barked, snapped, and growled at Ducommun when he drove his squad car onto Rob's property causing him to be wary of leaving his squad car. The fact that the dogs had been gentle in the presence of two persons on another occasion does not controvert the fact that they allegedly threatened Ducommun on other occasions in the park and on Rob's property by barking, growling, and snapping at him. The district court ruled, and we agree, that, there is no "evidence of any sort in the record that lends itself to the inference of a conspiracy to kill the dogs out of malice." To the contrary, the uncontroverted evidence establishes that the dogs were not licensed, appeared to be vicious, had attempted to attack, growl, bark, and snap at Officer Ducommun, and had been observed running at large in Josie Creek Park. The plaintiff has failed to specify a single fact that would demonstrate a genuine issue as to any material fact. We therefore hold that because the dogs were unlicensed and had been running at large, the defendants' actions in entering Rob's property without a search warrant were authorized under Wisconsin law and thus no issue of fact remains as to the plaintiff's claim of a Fourth Amendment violation.

The deputy sheriffs' conduct including the killing of the dogs and allowing their remains to rot and decay in the heat of the summer sun casts a dark cloud over the outstanding reputation law enforcement officers have so richly earned in their service in the State of Wisconsin. We also believe that the officers received sketchy legal advice from the district attorney when he advised them that "if the dogs were vicious and could not be apprehended, they should be destroyed," when in fact the law is clear that the officer should make an honest

effort to restrain, control, and capture the dogs before shooting.

It must be made clear that the officers assigned to capture the dogs certainly came less than prepared even though they had some six days (June 6 to June 12) to assemble the necessary equipment to effectuate the live capture of the dogs. The record is silent as to whether any effort was made to contact the young girl taking care of the dogs; furthermore, the record is clear that the neighbors were not contacted. Nor does the record recite that the officers came wearing gloves to avoid hand abrasions, with a rope nor any food with a tranquilizer in it in the hopes of enticing the dogs to them, or into a cage, but merely called the dogs from their squad car. Anyone knowing the natural actions of animals knows that ordinarily they will not respond to a stranger's call. In the year 1979, it would not be unusual to expect a law enforcement agency such as the Rusk County Sheriff's Department to have or to gain control of a tranquilizing gun from a nearby county, or Department of Natural Resources office, or purchase the same when on an assignment to capture three privately owned, domestic dogs on their owner's property while the owner was on vacation. It is noteworthy to point out that the Department of Natural Resources of this state frequently uses dart tranquilizer guns to capture deer to transport them to other areas and a mere phone call to that agency, we are confident, might very well have achieved the use of that implement to fulfill the good faith effort. We hasten to point out that the shooting of the animals is only a last resort and not to be used as a substitute for a good faith effort to capture the dogs. According to the record the dogs were running at large at this time and Rusk County did not have a dogcatcher. So, Ducommun merely called the dogs in his attempt to capture them at Rob's residence. Shooting four bullets into an animal as it attempts to flee its doghouse, leaving the other fatally wounded dog to die in the woods, and failing to properly dispose of their three carcasses certainly falls far below the standards of the expected conduct enunciated by the Wisconsin Law Enforcement Board. *See* Wis.Code LES § 3 (October 1984). Although we find the officers' conduct offensive, it does not support an action under § 1983 because it did not violate a right guaranteed under the United States Constitution. *Moore v. Kusper*, 465 F.2d 256, 258 (7th Cir.1972). Our disapproval is not to be misunderstood in any manner to infer that a law enforcement officer must subject himself to being attacked by an animal, including a dog, before he is allowed to protect himself and use his gun if he reasonably believes in the exercise of rational judgment that he is threatened with serious bodily harm by a vicious animal after a conscientious effort to capture the same. *See* Wis.Stat.Ann. § 174.01 (West Supp.1984).

An appellate court may affirm a grant of summary judgment if the judgment or order is correct, although the reasons given by the trial court are erroneous. *Archer v. United States*, 217 F.2d 548, 551 (9th Cir. 1954), *cert. denied*, 348 U.S. 953, 75 S.Ct. 441, 99 L.Ed. 745 (1955). Although we disagree in part with some of the rulings by the district court, for the reasons recited herein, we agree that the granting of the motion for summary judgment was proper.

The district court's grant of summary judgment to the defendants is AFFIRMED.