330 F.3d 194
 Ann ALTMAN; Robert Altman; Kimberly Larsen; Wendy Frye; Gilbert Wallace,Plaintiffs-Appellees,
v.
CITY OF HIGH POINT, NORTH CAROLINA; Bobby Ray Perdue, in his individual and official capacities; Nelson Moxley, in his individual and official capacities, Defendants-Appellants, and
Joni Chastain, in her individual and official capacities, Defendant.
 No. 02-1178.
 United States Court of Appeals, Fourth Circuit.
 Argued: January 21, 2003.
 Decided: May 20, 2003.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: James Redfern Morgan, Jr., Womble, Carlyle, Sandridge & Rice, P.L.L.C., Winston-Salem, North Carolina, for Appellants. Brandon Claus Fernald, La Mesa, California, for Appellees. ON BRIEF: Robert D. Mason, Jr., Womble, Carlyle, Sandridge & Rice, P.L.L.C., Winston-Salem, North Carolina, for Appellants. David Q. Burgess, Charlotte, North Carolina, for Appellees.
 Before LUTTIG, WILLIAMS, and GREGORY, Circuit Judges.
 Reversed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILLIAMS joined. Judge GREGORY wrote an opinion concurring in part and dissenting in part.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 This case arises out of several shooting incidents in the City of High Point, North Carolina (the "City" or "High Point"). In each incident, a High Point animal control officer shot and killed one or more dogs that were running at large in the city. Plaintiffs, the owners of the animals, brought suit under 42 U.S.C. § 1983, alleging that the officers' actions violated their Fourth Amendment rights. The district court denied the officers' qualified immunity defense, and the officers have appealed that ruling. Their appeal presents a question of first impression in this circuit, namely, whether a privately owned dog falls within one of the classes of property protected by the Fourth Amendment against unreasonable search and seizure. This issue, while ostensibly peripheral as a constitutional matter, is nevertheless of significant importance, and we consider it in depth. As we explain more fully below, we conclude that the dogs at issue in this case do qualify as property protected by the Fourth Amendment and that the officers seized that property. However, because in each instance the seizure involved was reasonable, we conclude that the officers did not violate the plaintiffs' Fourth Amendment rights. Accordingly, we reverse the district court's decision denying summary judgment to the officers and the City of High Point.
 
 I.
 
 2
 Because this case comes before us on appeal from the denial of summary judgment, except where otherwise noted, the following facts are recounted in the light most favorable to the plaintiffs, as they are the nonmovants in this action. Defendants Nelson Moxley and Bobby Ray Perdue are and were at all times relevant to this opinion employed by High Point as animal control officers. As animal control officers, Moxley and Perdue were charged with enforcing the various High Point ordinances governing dogs. High Point Ordinance § 12-2-1(a) makes it unlawful for the owner of a dog to allow the animal to "run at large" in the city. The ordinance defines "at large" to mean "a dog that is not in an enclosure or otherwise confined, or is not under the control of the owner or other person by means of a leash, cord or chain." H.P. Ordinance § 12-2-1(b). Animal control officers are tasked with impounding any animal found "at large." Id. § 12-2-6 ("It shall be the duty of the animal control specialist to capture and impound in the county animal shelter each and every unlicensed dog or any dog found unlawfully at large in the city as provided in this chapter."). Finally, city ordinance provides that "[i]t shall be lawful for the animal control specialist or police officers of the city to tranquilize or kill any dog at large within the city which cannot safely be taken up and impounded." Id. § 12-2-16(b) (emphasis added).[1]
 
 
 3
 It was Moxley and Perdue's efforts to enforce these ordinances that generated the four separate incidents which form the basis of this case. Each incident involves the shooting of one or more of the plaintiffs' dogs by either Moxley or Perdue. It is undisputed that in each incident, the dog or dogs were running at large within the meaning of High Point Ordinance § 12-2-16(b). We describe the incidents in chronological order.
 
 
 4
 The Larsen Incident. Plaintiff Kimberly Larsen was the owner of "Heidi," a purebred Rottweiler. Larsen testified that Heidi always wore a collar and tags. On January 10, 1997, Larsen left Heidi in her fenced yard while she and a family member left to run some errands. That same day, Officer Perdue responded to a call about a large, vicious Rottweiler that was loose and had chased and attacked, or attempted to attack, a citizen. When Officer Perdue arrived on the scene, he spoke with Willie Sturdivant, the citizen who had reported the incident. Sturdivant told Perdue that he had been chased by the dog and had only been able to escape the attack by beating the dog off with a stick. Sturdivant was scared to walk back down the street, so Officer Perdue gave him a ride.
 
 
 5
 After dropping off Sturdivant, Officer Perdue began searching for the loose dog. A local woman told Perdue to be careful of the dog because it was dangerous and aggressive and had been in the streets chasing cars and people. She also told him where the owners of the dog lived, although she noted that they were not home. Perdue next came upon Charles Elkins, a neighbor of the Larsens, walking on the street, and he stopped to warn Elkins about the loose dog. Elkins reported that the dog lived at the Larsens' and directed Perdue to the house. Officer Perdue pulled into the Larsens' driveway, exited his vehicle with his shotgun, and began to walk toward the home.
 
 
 6
 Elkins observed what happened next from a distance of about 150 feet. He said that as Perdue walked toward the home, Heidi came walking around the corner of the house. Heidi slowly approached Perdue and jumped or lunged from the driveway up into the yard. At this point, Heidi was ten to twelve feet from Perdue. Heidi then stopped, turned around, and began walking away from Perdue toward the street. Perdue then fired, striking Heidi in the hindquarters. He fired again to end the animal's suffering. Perdue dragged Heidi's remains to the end of the driveway and called sanitation to dispose of the body. He then left the scene.[2]
 
 
 7
 The Frye Incident. Wendy Frye owned four dogs — "Tut-Tut," "Bandit," "Boo Boo," and "Sadie" — that were approximately seven months old and weighed 15-20 pounds each. The dogs' mother was a Siberian Husky mixed-breed dog; it is unclear what breed their father was. The dogs wore collars but did not wear tags. They were kept in a pen in Frye's backyard but had a tendency to dig under the pen and escape.
 
 
 8
 On the morning of February 8, 1997, Officer Berman of the High Point Police Department responded to a call about a pack of dogs chasing people. According to him, when he arrived on the scene, the dogs charged his car, growling and showing their teeth. In the pack were three of Frye's dogs and two larger strays. Officer Berman remained in his car and called for Officer Perdue. While Berman waited for Perdue to arrive, the dogs ran across the street and began harassing a woman who was trying to exit her vehicle. Berman drove over and blew an air horn to disperse the dogs. The dogs ran, and the woman was able to leave her car and get to her residence. A man then came out of the residence. One of the dogs tried to bite him, but Berman again dispersed the dogs with his horn.
 
 
 9
 Shortly thereafter, Perdue arrived on the scene. The dogs aggressively rushed his truck as soon as he pulled up. One of the dogs jumped into the window of his truck and Perdue had to beat if off with his nightstick. When he exited the vehicle, the pack attacked him and Perdue fired into it with his shotgun, killing two of the dogs (Bandit and Tut-Tut). The rest of the pack disbursed.
 
 
 10
 The Wallace Incident. Plaintiff Gilbert Wallace owned a Golden Retriever/Labrador mixed-breed dog named "Sundance." Wallace asserts that Sundance was a well-behaved, passive dog, but that he had a habit of escaping from his fenced-in yard by digging under the fence. Wallace had several other dogs, which he also kept in a fenced area. Wallace had been cited on six previous occasions for allowing his dogs to run loose, and he had been warned about the poor condition of his fence. In addition, Officer Moxley had previously told Wallace that his dogs were becoming more aggressive.
 
 
 11
 On January 25, 1999, High Point Police Officer Blue responded to a call that a dog had bitten someone. When he arrived at the scene, a dog that Officer Blue described as a "black chow-lab mix," Sundance, charged him. Blue racked his shotgun, and the animal stopped, but continued to growl. Blue radioed for animal control to respond.
 
 
 12
 Blue then interviewed the bite victim, Lonnie Baldwin. Baldwin told Blue that the dog had chased his child to the bus stop. Baldwin chased the dog to protect his child, and the dog bit him on the hand. As Baldwin and Blue were talking, Officer Moxley arrived on the scene along with Officer Perdue. At this point, Sundance had retreated to Wallace's yard and was sitting outside the fence. Moxley informed Baldwin and Blue that this dog had given him problems in the past. He then got back in his truck and drove the short distance to the Wallace house.
 
 
 13
 Moxley exited his vehicle with his shotgun and proceeded toward the rear of the truck. At this point, Sundance charged at full speed, growling and showing his teeth. Moxley raised his shotgun and fired when Sundance was about five yards away, killing the dog. He then loaded the remains into his truck so the dog could be tested for rabies. Sundance was wearing no collar or tags.
 
 
 14
 The Altman Incident. The most recent of the four incidents involves plaintiffs Robert and Ann Altman, and their dog "Hot Rod," whose actual lineage was unknown but who the Altmans thought was at least part pit bull. According to the Altmans, Hot Rod was a non-aggressive, obedient dog, who always wore his collar and tags as required by law.
 
 
 15
 On the morning of March 24, 2000, Hot Rod was wandering the streets alone. Terry Evans, who owned a local business, saw Hot Rod following a meter reader, Roger Hendricks. Evans was familiar with Hot Rod, having seen him on the street before and having seen him behave aggressively. Fearing for Hendricks' safety, Evans called 911. When Officer Moxley arrived, Hot Rod "took off" toward the residential houses located further down the street. Moxley exited his vehicle with his shotgun and gave chase. Moxley fired between two of the houses in the direction of Hot Rod, who was about 75 yards away. Hot Rod was running behind the houses, and Moxley was running in front of the houses. He fired again between two houses in the direction of Hot Rod, who was approximately 50 to 60 yards away. Moxley fired a third shot, and Evans heard Hot Rod "hollar." Hot Rod emerged from behind the houses bleeding and dragging his hind leg, but was still running. Moxley had Hendricks retrieve more shells from his truck, and then pursued the dog. A short time later, a fourth shot was heard and Moxley emerged dragging the remains of Hot Rod.[3]
 
 
 16
 The plaintiffs brought suit under section 1983 against High Point, and Officers Moxley and Perdue, alleging that the officers' actions in shooting the plaintiffs' dogs constituted unreasonable seizures in violation of the Fourth Amendment.[4] The plaintiffs also asserted state law tort claims. All defendants moved for summary judgment, and the officers asserted qualified immunity. The district court rejected the officers' qualified immunity defense, and the defendants, both the officers and the City, timely appealed.
 
 II.
 
 17
 Because this appeal involves the denial of qualified immunity, we consider first whether the facts, viewed in the light most favorable to the plaintiffs, state a violation of the Fourth Amendment. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).[5] If so, we proceed to consider whether the right was clearly established; that is, whether it would have been apparent to a reasonable officer in the respective defendants' positions that his actions violated the Fourth Amendment. Id. at 201-02, 121 S.Ct. 2151. We review the district court's denial of qualified immunity de novo. See Rogers v. Pendleton, 249 F.3d 279, 285 (4th Cir. 2001).
 
 A.
 
 18
 The first issue then is whether the plaintiffs' Fourth Amendment rights have been violated. To resolve this issue, we must determine whether their dogs fell within the ambit of the Fourth Amendment. The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, provides that
 
 
 19
 [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....
 
 
 20
 U.S. Const. amend. IV. Plainly, a dog is not a "person," "house," or "paper." Thus, in order for a dog to be protected by the Fourth Amendment, it must fall within the category of "effects."
 
 
 21
 Neither the Supreme Court nor the Fourth Circuit has ever addressed the issue whether dogs are "effects." Three other circuits, the Third, Eighth, and Ninth, have considered whether dogs are protected by the Fourth Amendment. Those circuits have uniformly concluded, although based only on conclusory assertions, that dogs are indeed so protected. See Brown v. Muhlenberg Township, 269 F.3d 205, 209-10 (3d Cir.2001) (holding that dogs are "effects"); Fuller v. Vines, 36 F.3d 65, 68 (9th Cir.1994) (same); Lesher v. Reed, 12 F.3d 148, 150-51 (8th Cir.1994) (dogs are property subject to Fourth Amendment seizure requirements).[6] The complete absence of reasoning employed by those circuits, however, renders their dispositions of only the most minimal persuasive value.
 
 
 22
 Proceeding to analyze this issue that has been assumed away by the other circuits that have considered it, our inquiry begins with the text of the Constitution. James Madison drafted what would ultimately become the Fourth Amendment. In his final draft, which he submitted to the Committee of Eleven of the House of Representatives, Madison proposed an amendment which would read: "The rights of the people to be secured in their persons, their houses, their papers, and their other property, from all unreasonable searches and seizures, shall not be violated...." Annals of Cong., 1st Cong., 1st Sess., p. 452 (emphasis added); see also Nelson B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 310 & n.77 (1937). The Committee of Eleven altered Madison's draft by replacing "other property" with "effects," and it was that revised language that ultimately became part of the Constitution. Because there are no records of the Committee's deliberations, it is unclear precisely why that change was made.
 
 
 23
 The effect of that change is clear however; it narrowed the scope of the amendment. "Other property" would potentially have applied to all privately owned property, both personal and real. By contrast, "effects" referred only to personal property, and particularly to goods or moveables. See Dictionarium Britannicum (Nathan Baily ed., 1730) (defining "effects" as "the goods of a merchant, tradesman, & c"); Samuel Johnson, A Dictionary of the English Language (1755) (defining the plural of "effect" as "Goods; moveables"); 1 Noah Webster, First Edition of an American Dictionary of the English Language (1828) (defining "effect" as "[i]n the plural, effects are goods; moveables; personal estate"). The Supreme Court has since confirmed that "[t]he Framers would have understood the term `effects' to be limited to personal, rather than real, property." Oliver v. United States, 466 U.S. 170, 177 n. 7, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); see also id. at 177, 104 S.Ct. 1735 (noting that "the term `effects' is less inclusive than `property'"). Thus, it appears reasonably clear that, in 1791 when the Fourth Amendment was ratified, the term "effects" meant goods and moveables.
 
 
 24
 Under the common law as it existed in 1791, see Wyoming v. Houghton, 526 U.S. 295, 299, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999) ("In determining whether a particular governmental action violates [the Fourth Amendment], we inquire first whether the action was regarded as an unlawful search or seizure under the common law when the Amendment was framed."), dogs were not treated as property for most purposes. See, e.g., Citizens' Rapid-Transit Co. v. Dew, 100 Tenn. 317, 45 S.W. 790, 791 (Tenn.1898) ("It is true that at common law a dog was not considered as property...."); Harold W. Hannah, Animals as Property Changing Concepts, 25 S. Ill. U. L.J. 571, 575 (2001) (noting that "at common law dogs were not regarded as property"). For example, there was no commonlaw crime of larceny for taking and carrying away a dog. See Mullaly v. New York, 86 N.Y. 365, 366 (1881). This treatment of dogs under the common law at the time appears to have been a reflection of the sentiment that dogs "were base in their nature and kept merely for whims and pleasures" and thus possessed no intrinsic value. Dew, 45 S.W. at 791; see Mullaly, 86 N.Y. at 366-67. At the same time that dogs enjoyed only a limited property status, however, an owner of a dog could bring an action of trover for conversion of a dog, and dogs would pass as assets to the executor or administrator of a deceased owner. See Mullaly, 86 N.Y. at 366; see also 4 William Blackstone, Commentaries *236 (stating that a dog owner possessed "a base property" in his dogs that was sufficient to "maintain a civil action for the loss of them").
 
 
 25
 Thus, at least at the federal level, the prevailing understanding through much of the nineteenth century was that dogs were "property," even if only qualifiedly so. See Nicchia v. People of State of New York, 254 U.S. 228, 230, 41 S.Ct. 103, 65 L.Ed. 235 (1920) ("Property in dogs is of an imperfect or qualified nature and they may be subjected to peculiar and drastic police regulations by the state without depriving their owners of any federal right."); Sentell v. New Orleans & C.R. Co., 166 U.S. 698, 701, 17 S.Ct. 693, 41 L.Ed. 1169 (1897) ("[P]roperty in dogs is of an imperfect or qualified nature, and [ ] they stand, as it were, between animals ferae naturae, in which until killed or subdued, there is no property, and domestic animals, in which the right of property is perfect and complete."). As a result, at the time of the Founding, and for a period thereafter, it is unclear whether a dog would have been considered to be an "effect," i.e., a good or moveable. For, although the dog was treated as property for some purposes, it was generally valueless in the eyes of the law.
 
 
 26
 However, while dogs may not have been considered goods or moveables in every respect, their qualified status as property did render unto their owners interests similar to those asserted by the plaintiffs today. As discussed, at common law a dog owner could bring an action of trover for conversion of a dog. See Jones v. Craddock, 210 N.C. 429, 187 S.E. 558, 559 (1936) ("Even in the days of Blackstone, while it was declared that property in a dog was `base property,' it was nevertheless asserted that such property was sufficient to maintain a civil action for its loss."). The present action by the plaintiffs, though brought under a federal statute pursuant to a constitutional amendment, is not in nature unlike a common-law action for trover based on the officers' conversion of their dogs. In this way, the plaintiffs clearly assert a right with an analog at common law, a fact which strongly suggests that, at least to this extent, dogs would have been protected as "effects" within the meaning of the Fourth Amendment at common law.
 
 
 27
 This presumptive conclusion that dogs would have been protected as "effects" as that term was used at the time of the Framing, and therefore should be considered effects within the meaning of the Fourth Amendment, is reinforced by the Supreme Court precedent by which we are bound. Reviewing the cases in which the Court has addressed the meaning of "effects," it becomes apparent that the Court has treated the term "effects" as being synonymous with personal property. In United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court concluded that personal luggage was an "effect" within the meaning of the Fourth Amendment. See also Bond v. United States, 529 U.S. 334, 336-37, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000). While Place obviously does not hold that the term "effects" is coterminous with the universe of personal property, the Court's discussion does suggest that all seizures of personal property are subject to the Fourth Amendment's requirements. See Place, 462 U.S. at 701, 103 S.Ct. 2637 (stating that "the Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized"). In United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Court considered whether a wrapped parcel containing cocaine, which was intercepted during shipment, was an "effect." The Court held that "[w]hen the wrapped parcel ... was delivered to the private freight carrier, it was unquestionably an `effect' within the meaning of the Fourth Amendment. Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy...." Id. at 114, 104 S.Ct. 1652. As in Place, the Court's discussion in Jacobsen implies that it considers the term "property" to be coextensive with the term "effects." See id. at 113, 104 S.Ct. 1652 (explaining that "[a] `seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property").
 
 
 28
 Jacobsen, and the cases which preceded it, could be read to protect certain personal property only insofar as the possessor had a legitimate privacy expectation in that property, but in Soldal v. Cook County, Ill., 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), the Court clarified that the Fourth Amendment's protections extend to property in which there is no particular privacy or liberty interest. "We thus are unconvinced that any of the Court's prior cases supports the view that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty is also implicated." Id. at 65, 113 S.Ct. 538; see also id. at 62, 113 S.Ct. 538 (noting that "our cases unmistakably hold that the [Fourth] Amendment protects property as well as privacy").[7] Soldal thereby removed a potentially significant restriction on the types of property which the Fourth Amendment protects. The Court did state that "the [Fourth] Amendment does not protect possessory interests in all kinds of property," id. at 62 n. 7, 113 S.Ct. 538, but the only example the Court gave of a case involving an unprotected possessory interest was its decision in Oliver v. United States. In Oliver, the Court held only that open fields are not "effects" within the meaning of the Fourth Amendment, reaffirming Justice Holmes' opinion in Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). See Oliver, 466 U.S. at 176, 104 S.Ct. 1735. As discussed above, the Court also stated that the Framers would have understood the term "effects" to reference personal, as opposed to real, property. Id. at 177 n. 7, 104 S.Ct. 1735. Thus, the Supreme Court's cases appear to treat the scope of "effects" as congruent with the scope of personal property, and, after Soldal, it is clear that there need be no nexus between a privacy or liberty interest and the possessory interest for Fourth Amendment protection to attach.
 
 
 29
 These cases confirm, we believe, the conclusion that dogs merit protection under the Fourth Amendment. The common law personal property rights that attached to dogs were at least as strong as those that have been held sufficient by the Court to qualify other objects as "effects" entitled to Fourth Amendment protection. For example, the common law property interest in dogs was certainly as great as the possessory interest a person has been held by the Court to enjoy today in illegal narcotics. See Jacobsen, 466 U.S. at 124-25, 104 S.Ct. 1652 (concluding that destruction by officer of trace amount of cocaine for testing purposes "affect[ed] respondents' possessory interest protected by the [Fourth] Amendment" and thereby constituted a seizure). And, of course, that there may be no privacy interest in dogs is no bar to their treatment as effects, since Soldal explains that such an interest is not an eligibility requirement for Fourth Amendment protection.[8]
 
 
 30
 Accordingly, on the strength of the Constitution's text, of history, and of precedent, we hold that the plaintiffs' privately owned dogs were "effects" subject to the protections of the Fourth Amendment.
 
 
 31
 That dogs are, for Fourth Amendment purposes, "effects" under the analysis employed in the Supreme Court cases surveyed above is consistent with the fact that, as the common and statutory law in the states has developed, dogs have come to be recognized as property even under state law. While not recognized at the federal level for some time, early in the nineteenth century dogs began to gain status under state property laws, often by virtue of statutory enactment but also through the evolution of the common law. So it was that in New York, the Court of Appeals held in the 1881 case of Mullaly v. New York that the old common-law rule that there could be no larceny of a dog had been changed by legislation. See Mullaly, 86 N.Y. at 368. The Court of Appeals reasoned that "[t]he artificial reasoning upon which these [old common-law] rules were based are wholly inapplicable to modern society.... Large amounts of money are now invested in dogs and they are largely the subject of trade and traffic. In many ways they are put to useful service, and so far as pertains to their ownership as personal property, they possess all the attributes of other personal property." Id. at 367-68. Of particular note, the Court of Appeals in Mullaly concluded that dogs were "personal property," which was defined in New York as "`goods, chattels, effects, evidences of rights of action,' and certain written instruments." Id. at 368 (emphasis added). By 1898, the Supreme Court of Tennessee could confidently state that the old common-law rules denying treatment as property to dogs had been abandoned and that "dogs have now a distinct and well-established status in the eyes of the law." Dew, 45 S.W. at 791.
 
 
 32
 North Carolina is no stray when it comes to the trend in favor of treating dogs as personal property; indeed, North Carolina appears to have been at the forefront of that trend. In the case of Dodson v. Mock, 20 N.C. 282 (1838), the Supreme Court of North Carolina considered a civil action by a plaintiff to recover damages for the killing of his dog. The defendant contended that the dog was not property because it had no value, and therefore no action would lie for an injury to it. The Supreme Court of North Carolina rejected that argument and held that "[d]ogs belong to that class of domiciled animals which the law recognises as objects of property, and whatever it recognises as property, it will protect from invasion by a civil action on the part of the owners." Id.; see also, e.g., State v. Smith, 156 N.C. 628, 72 S.E. 321, 322 (1911) (referring to dogs as "personal property"); Jones, 187 S.E. at 559 ("While from the earliest times dogs have been the companions of man, for a long period their legal status was of low degree, and it was formerly held they were not property, and hence not the subjects of larceny. But in more recent times this ancient doctrine has given place to the modern view that ordinarily dogs constitute species of property, subject to all the incidents of chattels and valuable domestic animals."). Today, dogs are also treated as personal property by the statutes of North Carolina. See, e.g., N.C. Gen.Stat. § 14-81 (treating larceny of dogs as a property offense); id. § 67-4.1(a)(3) (defining "owner" as "any person or legal entity that has a possessory property right in a dog").
 
 B.
 
 33
 Given our holding that the dogs at issue in this case were "effects" within the meaning of the Fourth Amendment, we must next consider whether the officers' actions in the case at bar constituted "seizures" of the dogs and, if so, whether those seizures were constitutionally permissible. Turning to the former question, we think it clear that the officers' actions constituted a seizure of the dogs. A Fourth Amendment "seizure" of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property." Jacobsen, 466 U.S. at 113, 104 S.Ct. 1652. Destroying property meaningfully interferes with an individual's possessory interest in that property by changing a temporary deprivation into a permanent deprivation. See id. at 124-25, 104 S.Ct. 1652. Thus, when the officers destroyed the dogs, they "seized" the plaintiffs' "effects." See Brown, 269 F.3d at 210; Fuller, 36 F.3d at 68.
 
 
 34
 In order for the officers' warrantless seizures of the plaintiffs' dogs to be constitutional, the seizures must have been "reasonable." A seizure of personal property conducted without a warrant is presumptively unreasonable. See Place, 462 U.S. at 701, 103 S.Ct. 2637. Under the basic reasonableness calculus, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion." Id. at 703, 103 S.Ct. 2637. The reasonableness calculus is objective in nature; it does not turn upon the subjective intent of the officer. Cf. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (stating, in the context of a Fourth Amendment excessive force claim, that "the question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"). The Supreme Court has admonished that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S.Ct. 1865. Finally, in judging the reasonableness of the officers' actions, we assess only the reasonableness of their actions vis-a-vis the dogs; we do not consider potential harm to third parties. Cf. Howerton v. Fletcher, 213 F.3d 171, 175 (4th Cir.2000) (holding that the "risk posed to third parties by the official use of force is not to be considered" in determining whether an official used excessive force as against a particular plaintiff). The task of this court is to put itself into the shoes of the officers at the time the actions took place and to ask whether the actions taken by the officers were objectively unreasonable.
 
 
 35
 Engaging in that exercise in the instant case can render only the conclusion that, in every incident, the actions of Officers Moxley and Perdue were objectively reasonable. Before delving into the peculiar facts of each incident, we note the overarching interests involved. On the one hand, the public interests in this case are significant. The state of North Carolina and the City of High Point have a substantial interest in protecting their citizens from all the dangers and nuisances associated with dogs. Dogs may harass or attack people, livestock, or other pets. Dogs can maim or even kill. Dogs may also spread disease or cause property damage. On the other hand, the private Fourth Amendment interests involved are appreciable. Dogs have aptly been labeled "Man's Best Friend," and certainly the bond between a dog owner and his pet can be strong and enduring. Many consider dogs to be their most prized personal possessions, and still others think of dogs solely in terms of an emotional relationship, rather than a property relationship.
 
 
 36
 The case before us does not present both interests at their zenith, however. When a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal and preventing the evils mentioned above waxes dramatically, while the private interest correspondingly wanes. Put simply, while we do not denigrate the possessory interest a dog owner has in his pet, we do conclude that dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance. This understanding is reflected in High Point Ordinance § 12-2-16, which provides that when a dog is running at large it may be tranquilized or even killed if it cannot be safely taken up and impounded.
 
 
 37
 With that understanding, we turn to the particular facts before us. Again, it is undisputed that in each incident, the dog or dogs involved were running at large. In the Larsen Incident, Officer Perdue was confronted with a Rottweiler, a large and dangerous breed of dog, that was loose and had been roaming the neighborhood. The dog had already attacked one person in the neighborhood, and Perdue would have understood from his conversations with people in the neighborhood that the dog was aggressive and dangerous. While the dog did not actually attack Officer Perdue, it did move back toward the road where it would once again pose a danger to the neighborhood. Perdue acted to stop the dog from escaping by the one means available to him at that instant — a shotgun. While, in hindsight, it may appear that Perdue had other options available, we are not prepared to dispute his judgment at the moment, confronted as he was by a large, dangerous Rottweiler that had already attacked one person in the neighborhood.
 
 
 38
 Officer Perdue's actions in the Frye Incident were likewise reasonable. He was confronted not simply by a single dog, but by a pack of five dogs that had attacked persons in the neighborhood and another officer. Indeed, one of the dogs had attacked Perdue himself, attempting to jump into his truck window. When he exited his vehicle, the pack charged him. Perdue was entitled to shoot the dogs in self-defense. The only fact that weighs against the reasonableness of Perdue's actions is that three of the dogs were young and not particularly large. While that fact may be significant when an officer confronts a smaller dog one-on-one, it is of less moment when the officer is attacked by a pack of dogs. Obviously, the danger presented by a dog increases significantly when that dog joins others in a pack.
 
 
 39
 Officer Moxley's actions in the Wallace Incident were also clearly reasonable. There, the officer was confronted with a dog that had already attacked and wounded one person in the neighborhood. Moments after Moxley exited his truck, the animal attacked him. Moxley acted reasonably in defending himself using the shotgun he was carrying at the time.
 
 
 40
 The Altman Incident presents a somewhat closer case since Hot Rod had not actually attacked a person. We nevertheless conclude that Officer Moxley's actions were reasonable. Hot Rod was part pit bull, and pit bulls, like Rottweilers, are a dangerous breed of dog. While Hot Rod had not attacked anyone, his behavior toward the meter reader was sufficiently aggressive to cause Evans to call the police. Responding to that call, Officer Moxley was immediately confronted with a fleeing dog. It was not unreasonable for him to conclude, in that split second as Hot Rod sped away, that he could not safely capture the animal. Thus, as High Point Ordinance § 12-2-16(b) instructs him to do, Officer Moxley attempted to and succeeded in killing the animal, thereby removing, for all Moxley knew, a potentially dangerous pit bull from the public streets.
 
 
 41
 Because none of the incidents involved objectively unreasonable action by the officers, we therefore hold that the officers committed no unreasonable seizure in violation of the Fourth Amendment. It is important to note that we are not saying the officers' responses in these cases were the best possible responses. We are only saying that, under the circumstances existing at the time the officers took the actions and in light of the facts known by the officers, their actions were objectively reasonable. In retrospect, it may have been preferable if the officers attempted first to use nonlethal force in every instance. Such nonlethal force may have been successful, but, tellingly, it may not have been. Even dog owners can find their pets to be unpredictable at times. How much more so a person who is not intimately familiar with the behavior of the particular animal (as neither Officers Perdue nor Moxley were in any of these cases) and who is forced to confront the dog for the first time in an unsupervised, unenclosed environment.[9]
 
 
 42
 We are also not passing on the results reached by the other circuits that concluded, on the facts before them, that the destruction of pet dogs was unreasonable. The fact that all the dogs in the instant case were running at large, uncontrolled and with no owner looking on, renders this case distinguishable from the Third Circuit's decision in Brown and the Ninth Circuit's decision in Fuller. In Brown, the owner of the dog was looking on and willing to assert control over the animal. See Brown, 269 F.3d at 211 (concluding that a state may not "consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody"). In Fuller, the owners of the dog were standing in their front yard with the dog when it was shot. See Fuller, 36 F.3d at 66. The private Fourth Amendment possessory interests are obviously stronger when, although the dog is unleashed, the owner is nearby and attempting to assert control over the dog. And the public interest in control of the dog is correspondingly lessened when a private owner is available to assert control.[10]
 
 
 43
 Given our conclusion that the officers' actions did not violate the plaintiffs' Fourth Amendment rights, we need not reach the second step of the qualified immunity analysis and determine whether the right was clearly established.
 
 III.
 
 44
 Our colleague, Judge Gregory, concurs with our conclusions that dogs are "effects" for purposes of the Fourth Amendment and that the dogs at issue in this case were the objects of warrantless seizures. Post at 214. He dissents from our resolution of the question of whether a constitutional violation occurred. Judge Gregory criticizes us for "improper[ly] focus[ing] on `the particular facts' of each, specific incident." Id. at 214. Instead, he prefers to view the case "as a general matter" and concludes that "viewing the evidence in the light most favorable to the plaintiffs, it is apparent that `the facts alleged show the officer[s'] conduct violated a constitutional right.'" Id. at 220. The dissent then proceeds to consider whether Officers Moxley and Perdue are entitled to qualified immunity. Such immunity would be inappropriate here, reasons the dissent, because an officer violates clearly established federal law "when he shoots and kills an individual's family pet when that pet presented no danger and when nonlethal methods of capture would have been successful." Id. at 220.
 
 
 45
 It is the dissent's analysis that is contrary to clearly established precedent, though. For fear that that flawed analysis will further erode the clarity of qualified immunity law, we feel that we must address some of the dissent's errors.
 
 A.
 
 46
 First, the dissent's only apparent authority for its conclusion that the seizures at issue in this case were unreasonable is its own assertion that Officers Moxley and Perdue failed to comply with some High Point City ordinances and with certain High Point Police Department regulations. The dissent is replete with citations to these sources, see post at 218, 219, 220, 222, 223, to the near complete exclusion of all other forms of authority. In short, the dissent appears to reason that the officers were acting unconstitutionally because they violated the standards set by city ordinance and police department regulation.
 
 
 47
 This court, and the Supreme Court, have both rejected such reasoning categorically. Recently, in Robles v. Prince George's County, Maryland, 302 F.3d 262 (4th Cir.2002), the Fourth Circuit considered whether police officers who bound a defenseless man to a pole with flex cuffs at three in the morning in a deserted parking lot and then abandoned him, all with admittedly no legitimate law enforcement purpose, were entitled to qualified immunity. This court found that the officers had committed a constitutional violation under Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), but, despite the officers' utterly indefensible behavior, we nevertheless awarded them qualified immunity. Said the court,
 
 
 48
 [t]he Constitution is not a "font of tort law" to be "superimposed upon whatever systems may already be administered by the States." The officers' conduct violated police regulations as well as state law and was dealt with under those provisions. But not every instance of inappropriate behavior on the part of police rises to the level of a federal constitutional violation.
 
 
 49
 Id. at 271 (internal citation omitted) (former emphasis added); see also, e.g., Screws v. United States, 325 U.S. 91, 108, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) ("Violation of local law does not necessarily mean that federal rights have been invaded."). To conclude, as apparently would the dissent, from the mere occurrence of a state law violation, much less a violation of city ordinance or police regulation, that a federal constitutional violation must also have transpired, is to engage in non sequitur. The dissent argues that such is not the case because "[f]lagrant disregard of these [local] laws ... is relevant from an evidentiary perspective to show that a reasonable officer confronting the same situations as the defendants would have acted differently." Post at 219. The logical flaw of that argument lies in its unspoken premise, namely that the standards set by local law in fact coincide with the reasonableness standards set by the Fourth Amendment. That these two independent authorities would happen to be in perfect alignment is not impossible, but it seems unlikely, and the dissent has proffered no reasons to bolster its premise that such is the case.
 
 B.
 
 50
 Second, in keeping with what appears to be an emerging interpretive trend in this circuit prompted obviously by discomfort with the court's decision in Robles v. Prince George's County, see Jones v. Buchanan, 325 F.3d 520 (4th Cir.2003); Robles v. Prince George's County, Maryland, 308 F.3d 437 (4th Cir.2002) (opinion concurring in the denial of rehearing en banc), the dissent adopts a revisionist reading of that decision. The dissent describes Robles as "holding that a reasonable officer could not have been expected to anticipate that ten to fifteen minutes of unauthorized detention would amount to a greater than de minimis injury." Post at 214.[11] Similarly, the dissent opines that "[i]n Robles, the Court's constitutional calculation of what would be a de minimis injury was an unusually close call." Id. at 215. To support its interpretation of Robles, the dissent relies heavily, not on Robles itself, as one might expect, but rather on two other opinions, this court's decision in Jones v. Buchanan and the opinion concurring in the denial of rehearing en banc in Robles. The former opinion, which mentioned Robles only in the penultimate footnote, certainly did not contain a holding as to the holding of Robles, contrary to the dissent's suggestion. The latter opinion, as I have elsewhere explained, see Jones, 325 F.3d at 538-40 (Luttig, J., dissenting), also sheds no light on the holding of Robles and, indeed, the dissent's reliance on the concurrence in the denial of rehearing is merely another example of the tendency of such opinions to sow confusion as to the law.
 
 
 51
 Turning to the actual language used in the Robles opinion, it is clear that the court did not rest its qualified immunity analysis on the closeness of the question of whether there had been more than de minimis injury. There is no mention of the closeness of the injury in the portion of the court's opinion devoted to determining whether there had been a violation of clearly established federal law. That portion of the opinion simply explains that
 
 
 52
 [t]he cases cited by plaintiff [as putting the defendants on notice] ... are inapposite. They involve instances where detainees were subject to physical abuse or prolonged and inhumane conditions of detention. Although the officers' actions in this instance were foolish and unorthodox, it is also not clear that at the time they acted they should have reasonably known that their conduct violated Robles' constitutional rights.
 
 
 53
 Robles, 302 F.3d at 271 (internal citations omitted). The Robles court clearly relied only on the absence of factually similar legal authority. The dissent chides us for failing to recognize that the legal authority was factually dissimilar only "because Robles' case presented the Court with a closer call on the de minimis inquiry." Post at 216. But a statement that the injuries were different could be read to connote either difference in kind, i.e., physical abuse as opposed to mental anguish, or difference in quantity, i.e., that Robles' injuries were of a lesser magnitude. The former reading provides no support to the dissent and even if Robles can be read to state the latter, such would establish merely that Robles' case was closer than those other cases, not that it was itself a close case with respect to de minimis injury.
 
 
 54
 The court does discuss the quantitative degree of injury in its analysis of whether the plaintiff had established a constitutional violation at all. That discussion, however, does not even hint that the question was close. If anything, it bespeaks the contrary. Said the court,
 
 
 55
 any reasonable person would have been upset by what happened here. Robles was tied up in a dark and deserted location in the middle of the night. He did not know when or if anyone would come to rescue him or who might discover him. The resulting injury was more than de minimis.
 
 
 56
 Id. at 270.
 
 
 57
 Presumably reading this same language from Robles, the dissent divines that the entire Robles opinion turned on the closeness of the injury question. As the dissent would have it, the Robles court's statement that "the resulting injury was more than de minimis" clearly shows that in fact the de minimis injury issue was an "unusually close call," over which the court was torn. Then, exhausted from its struggle with this difficult question — which, incidentally, resulted in only a single paragraph of analysis — the panel decided that rather than explicitly mentioning how pivotal that issue was to its qualified immunity analysis, it would instead incorporate its implicit internal struggle into that analysis sub silentio.
 
 
 58
 We are chary of an interpretive methodology, such as the dissent's, that would allow for hidden reasoning and implicit holdings. Reading the opinion as it was written, one cannot but conclude that the Robles opinion turned only on what the Robles opinion says it turned on — the lack of factually similar legal precedent. This is not to say that the Robles opinion would not make sense if it read as the dissent and others would have it read. It is merely to say that it is not susceptible to such a reading.
 
 C.
 
 59
 Third, the dissent's qualified immunity analysis is seemingly premised upon standards foreign to the precedent in this area. It is certainly true that an officer is not entitled to qualified immunity when he violates clearly established federal law. But to argue that the conditions that must obtain in order to establish a clear violation are present in this case is counterfactual.
 
 
 60
 To establish a clear violation of a federal right, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal citation omitted). A clear violation of federal law may occur when precedent, either from the Supreme Court, the circuit in which the case arises, or a consensus of cases from other circuits, puts the officer on notice that his conduct is unconstitutional. See Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).
 
 
 61
 The dissent's effort to adduce relevant legal authority is ineffective. At the time Officers Moxley and Perdue acted, neither the Supreme Court nor the Fourth Circuit had held that dogs were "effects" within the meaning of the Fourth Amendment. Nor had either court issued any opinion as to the Fourth Amendment reasonableness standards governing seizure of dogs. Indeed, a review of the Supreme Court's cases would have revealed that "dogs ... may be subjected to peculiar and drastic police regulations by the state without depriving their owners of any federal right," Nicchia, 254 U.S. at 230, 41 S.Ct. 103, a statement that hardly would have put Officers Moxley and Perdue on notice that their actions violated federal law.
 
 
 62
 Perhaps sensing this weakness, the dissent seeks to marshal a consensus of cases from other circuits, but no such consensus existed at the time of the actions at issue here. The only circuit cases of any relevance were Lesher v. Reed, 12 F.3d 148 (8th Cir.1994), and Fuller v. Vines, 36 F.3d 65 (9th Cir.1994). The dissent asserts that these cases held "that an officer commits an unreasonable, warrantless seizure of property ... when he shoots and kills an individual's family pet when that pet presented no danger and when nonlethal methods of capture would have been successful." Post at 220. According to the dissent, these cases also held that such a right was clearly established. See id. at 224.
 
 
 63
 The dissent's ascription of such a holding to Lesher is baffling. The claim at issue in Lesher was whether officers violated the Fourth Amendment by taking a dog from the plaintiffs' home. See Lesher, 12 F.3d at 150 ("The Leshers complain that [the] officers ... removed their dog from their home without their consent."). The opinion says nothing about a shooting. While Lesher did hold that such police action could constitute a Fourth Amendment seizure, it remanded to determine whether the seizure was unreasonable. Id. at 151. Moreover, no qualified immunity defense was mentioned in Lesher, so naturally there was no holding as to whether the Fourth Amendment right asserted was clearly established. Thus, every fact or holding the dissent attributes to Lesher was either expressly disclaimed by the opinion itself or not mentioned because it did not exist.
 
 
 64
 The dissent is left with Fuller v. Vines, which, as explained above, is distinguishable and thus of little relevance. Indeed, the iteration of that case on which the dissent relies to establish the proposition that the right was clearly established has, by its own terms, no precedential value. See post at 224 (citing Fuller v. Vines, 1997 WL 377162 (9th Cir.) (unpublished)).
 
 
 65
 There is one remaining avenue open to the dissent. Qualified immunity is also inappropriate when the action at issue was so obviously unconstitutional that, even though no precedent was factually similar, any reasonable officer would have known from the general contours of the law that his action was in violation thereof. See United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ("But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though `the very action in question has [not] previously been held unlawful[.]'" (quoting Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. 3034)). This is a difficult standard to satisfy, see Lanier, 520 U.S. at 271, 117 S.Ct. 1219 (suggesting that a section 1983 case accusing welfare officials of selling foster children into slavery would satisfy the standard), and it has been rendered even more so in this circuit by the Robles decision. For, if binding a man to a pole in the middle of a deserted parking lot at three in the morning and abandoning him all for no legitimate law enforcement purpose was not clearly unconstitutional, then few things will be. Indeed, it follows a fortiori from the fact that it was far from obvious, even to a court of law, that dogs are "effects" protected by the Fourth Amendment, that the officer on the beat could not reasonably be expected to know that his seizure of a dog might violate the Fourth Amendment.
 
 
 66
 Despite the difficulty of the issue of whether dogs are even protected by the Fourth Amendment, the dissent seemingly believes that, unlike lashing a defenseless man to a pole in the middle of the night and leaving him, shooting dogs that are running at large does present one of those rare instances of a clear constitutional violation, notwithstanding the absence of relevant precedent. Says the dissent,
 
 
 67
 Moxley and Perdue insisted on disregarding local law by firing buckshot throughout the City's neighborhoods, and as a result, they killed several nondangerous and nonthreatening dogs owned by the plaintiffs as family pets. Viewing the facts in the light most favorable to the plaintiffs, it is clear that the officers carried out these warrantless seizures without any concern for the public's safety. As a result, Moxley and Perdue must be expected to know that their shooting spree was unconstitutionally unreasonable.
 
 
 68
 Post at 225.
 
 
 69
 This observation is at least arguably accurate if the dissent intends to use the term "unreasonable" colloquially, although such would be irrelevant to the Fourth Amendment analysis at issue in this case. To supply the "unconstitutionally" modifier, however, gives rise to the expectation that the standards used to assess reasonableness are those supplied by the Constitution itself. Reasonableness alone is nothing but a standard after all. One cannot assess the reasonableness of an action without taking into account certain factors. For legal purposes, those factors are provided by the substantive area of the law that governs the case and they form the parameters of the reasonableness judgment. So it is that Fourth Amendment excessive force reasonableness involves the assessment of different factors than, say, the question of whether an agency's interpretation of an ambiguous statute that it administers is reasonable. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 70
 When we speak of Fourth Amendment reasonableness, we are taking many factors into consideration, but not all. We are not, for example, considering the potential harm to third persons or animals. Cf. Howerton v. Fletcher, 213 F.3d at 175. Yet the dissent seems to be taking such harms into account in its analysis. See, e.g., post at 218 ("If anything, it is clear that the decision to shoot was made in spite of the fact that it would dramatically increase the danger to the public." (emphasis added)); id. at 224. Nor do we treat as dispositive possible violations of state or local law, or police regulation. Yet the dissent's analysis relies almost exclusively on purported violations of city law and police practice to establish a constitutional violation and to deny immunity. See, e.g., post at 220, 222, 223, 224, 225. We think it clear that the dissent has not actually engaged in Fourth Amendment reasonableness analysis at all, but rather has simply given its personal opinion as to the appropriateness of the officers' actions. So understood, we reiterate that we do not necessarily disagree with the dissent's opinion, but only with its conclusion that the Constitution imposes or permits imposition of such personal standards upon the officers in this case. Since, under the factors provided for consideration by the Fourth Amendment, the officers' conduct was not violative of the Constitution and a fortiori not so clearly so as to deprive them of qualified immunity, the dissent's willingness to allow this case to proceed finds no basis in the law of qualified immunity.
 
 
 71
 What really seems to be driving the dissent is a concern that Officers Moxley and Perdue are out to get the animals of High Point. The dissent describes the unfortunate encounters these officers have had with various animals on occasions predating the incidents at issue here, and concludes that "Moxley and Perdue adopted a ... cavalier and reckless attitude towards animal control." Id. at 219. Time and again, the dissent implies that Officers Moxley and Perdue were unreasonable because of their history of animal shootings and because of the officers' personal views regarding the most efficacious methods of animal control. See, e.g., id. at 223-24 (quoting Officer Moxley on the use of deadly force); id. at 225.
 
 
 72
 Such subjective considerations, however, are irrelevant as a matter of law. Both the analysis regarding the merits of the constitutional violation and the qualified immunity analysis focus on whether the officer acted in an objectively reasonable manner in this particular case, without regard to the officer's actual subjective intent or malice and without regard to possibly inappropriate actions the officer took on other occasions. See Graham, 490 U.S. at 397, 109 S.Ct. 1865 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force."); Crawford-El v. Britton, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."). Thus, the dissent's proffer of what amounts to little more than character evidence with respect to Officers Moxley and Perdue is simply not germane. Certainly if Officers Moxley and Perdue have engaged in a practice of malicious and unnecessary killing of animals, such conduct is worthy of censure. Yet we would incur greater censure, and deservedly so, were we to allow our own personal views of the appropriateness of particular actions to color our interpretation of what the Constitution requires.
 
 
 CONCLUSION
 
 
 73
 The judgment of the district court is reversed and the case is remanded with instructions to enter judgment for the defendants — Officers Moxley and Perdue, and the City of High Point.
 
 
 74
 
 REVERSED.
 
 
 
 
 Notes:
 
 
 [1]
 Dogs must also wear tags issued by the city. H.P. Ordinance § 12-2-14
 
 
 [2]
 Perdue remembers things happening differently. According to Perdue, he saw the Rottweiler standing in the middle of the street. The Rottweiler was big and acting in a crazed, aggressive manner by growling and moving back and forth. The animal suddenly charged him and he used deadly force in self-defense
 
 
 [3]
 Moxley recalls a different version of the events. According to him, when he arrived at the scene, Hot Rod was growling at Hendricks from under some bushes. Moxley got out of his truck with his shotgun and proceeded toward the back of the truck to get his catchpole. Hot Rod charged, but stopped and retreated when Moxley raised his gun. Moxley continued toward the rear of his truck when Hot Rod charged again. This time, Moxley fired, wounding but not killing the dog. Hot Rod ran, and Moxley pursued, firing twice more. Finally, after retrieving more shells, Moxley ended Hot Rod's suffering
 
 
 [4]
 Plaintiffs also brought suit against Officer Chastain, the supervisor of Moxley and Perdue, on a supervisory liability theory. The district court granted summary judgment to Chastain, and the plaintiffs have not appealed that ruling
 
 
 [5]
 The plaintiffs' complaint also claimed that the officers' actions violated the Fifth and Fourteenth Amendments insofar as they deprived the plaintiffs of property without due process of law. The plaintiffs, however, did not argue that claim below, J.A. 531 n.5, and they have not raised it on appeal. Thus, the plaintiffs have abandoned their Fifth and Fourteenth Amendment claim, and we do not consider whether any of these incidents involved a deprivation of property without due process of law
 
 
 [6]
 Defendants argue that the circuit authority is not uniform, pointing to the Seventh Circuit's decision inPfeil v. Rogers, 757 F.2d 850 (7th Cir.1985). In Pfeil, the plaintiff claimed that officers violated his son's Fourth Amendment rights by entering his property and shooting his dogs. It is true that the Pfeil court did conclude that the officers' conduct in shooting the dogs did not support a section 1983 action "because it did not violate a right guaranteed under the United States Constitution." Id. at 866. But we think that the defendants read too much into this blanket statement. It does not appear from the Seventh Circuit's opinion in Pfeil that the court was considering whether the officers' conduct constituted a Fourth Amendment seizure of the dogs. Indeed, the Seventh Circuit characterized the plaintiff's Fourth Amendment claim as one for warrantless entry and had dismissed that claim earlier in the opinion. See id. at 865. Because the Seventh Circuit did not consider whether the actions constituted a Fourth Amendment seizure of the dogs, it can hardly be said that its opinion included a holding with respect to that issue.
 
 
 [7]
 The Court also explained that the Fourth Amendment's protections do not change based on the nature of the legal context,i.e., it applies in the civil as well as a criminal context, Soldal, 506 U.S. at 67, 113 S.Ct. 538, or on the motive of the government actor engaging in the search or seizure, id. at 69, 113 S.Ct. 538.
 
 
 [8]
 For that matter, the police officers' purpose in shooting the dogs is also irrelevant to their status under the Fourth AmendmentSee Soldal, 506 U.S. at 69, 113 S.Ct. 538.
 
 
 [9]
 In one incident — the Wallace Incident — Officer Moxley had encountered the dog, Sundance, before. However, Moxley's prior encounters with Sundance had given him the impression that the dog was aggressive. As a result, that prior experience only supports the reasonableness of Moxley's response when Sundance attacked him
 
 
 [10]
 High Point has also appealed the denial of summary judgment. Normally, High Point's appeal would be improper because the denial of summary judgment is not a final order subject to interlocutory appeal and High Point cannot defend on the basis of qualified immunity. However, our resolution of the claims against Officers Moxley and Perdue fully resolves the claims against High Point as well, since a municipality cannot be liable in the absence of a constitutional violation by one of its agentsSee City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). For that reason, we find that the issues raised by High Point on appeal are "inextricably intertwined" with those raised by the officers. Accordingly, we will exercise pendent appellate jurisdiction over High Point's appeal and reverse the district court's denial of summary judgment as to the City. See Moore v. City of Wynnewood, 57 F.3d 924, 929 (10th Cir.1995) (concluding that pendant appellate jurisdiction was appropriate because resolution of claims against officer fully resolved the claims against the municipality).
 
 
 [11]
 A necessary element of the plaintiff's case inRobles was proof that he had suffered more than de minimis injury. See Robles, 302 F.3d at 269.
 
 
 
 75
 GREGORY, Circuit Judge, concurring in part and dissenting in part:
 
 I.
 
 76
 I concur with the majority's conclusion that an individual's dog is an "effect" for purposes of the Fourth Amendment, and with the Court's finding that the dogs at issue in this case were the objects of warrantless seizures. I respectfully dissent, however, from the majority's consideration of the qualified immunity issue in Part II.B. In particular, I am disturbed by the majority's finding that the officers' actions in each instance were reasonable, based as it is on the majority's dogged refusal to consider the facts in the light most favorable to the nonmovants. Additionally, I am troubled by the majority's confusion of the qualified immunity test announced by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Rather than recognizing the two, distinct steps outlined by the Saucier Court, the majority errs by effectively conflating the two prongs and creating a one-step test.
 
 
 77
 As explained below, I conclude that the plaintiffs, as a general matter, have demonstrated a violation of their constitutional rights to be free from unreasonable seizures. See Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Additionally, I find that in the specific context of each incident, viewing the incidents in the light most favorable to the plaintiffs, the plaintiffs' constitutional rights were clearly established. Accordingly, I would affirm the district court's ruling that Officers Moxley and Perdue are not entitled to qualified immunity, and that the City of High Point is not entitled to summary judgment.
 
 II.
 A.
 
 78
 Officers performing discretionary duties are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396. 818 (1982). Officers Moxley and Perdue are entitled to qualified immunity unless: (1) "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer[s]' conduct violated a constitutional right"; and (2) the right was "clearly established ... in the specific context of the case." Saucier, 533 U.S. at 201, 121 S.Ct. 2151. See also Mansoor v. Trank, 319 F.3d 133, 137 (4th Cir.2003).
 
 
 79
 The majority's finding that the plaintiffs have failed at the first step of the qualified immunity test is rooted primarily in the Court's improper focus on "the particular facts" of each, specific incident. Ante, at 206. At the first stage of our analysis, we are merely to consider the "threshold question" of whether any "constitutional right would have been violated were the [plaintiffs'] allegations established." Saucier, 533 U.S. at 201, 121 S.Ct. 2151. "[I]f, taking the allegations or evidence (depending on the procedural posture of the case) in the best light for the plaintiff, the plaintiff has stated a violation of a constitutional right, we proceed to the second step." Jones v. Buchanan, 325 F.3d 520, 526 (4th Cir. 2003). In conducting this initial inquiry, the Supreme Court has "assume[d] a constitutional violation could have occurred under the facts alleged based simply on the general rule prohibiting excessive force, [and] then proceed[ed] to the question whether this general prohibition against excessive force was the source for clearly established law that was contravened in the circumstances this officer faced." Saucier, 533 U.S. at 207-08, 121 S.Ct. 2151.
 
 
 80
 Similarly, this Court in Robles v. Prince George's County, 302 F.3d 262 (4th Cir.2002), found that a pretrial detainee satisfied the first prong of the qualified immunity inquiry with his allegation that he suffered a deprivation of a due process right when Prince George's County police officers tied him to a metal pole in a deserted shopping center and abandoned him there at 3:30 a.m., only reporting the incident to the neighboring Montgomery County Police Department. Id. at 267-70. Ten to fifteen minutes later, Montgomery County officers arrived to untie Robles and take him into custody. Id. at 267. To make his constitutional showing, Robles had to show, in part, "that the injury resulting from [the officers'] actions was more than de minimis." Id. at 269. Even though Robles suffered no physical injury, and even though his detention lasted as little as ten minutes, we found that the resulting mental and emotional distress suffered by Robles was "more than de minimis." Id. at 270. As such, he successfully alleged a violation of a constitutional right. In Robles, the Court's constitutional calculation of what would be a de minimis injury was an unusually close call, and for this reason, it could not be said, at the second stage of the qualified immunity analysis, that the constitutional violation was "clearly established" at the time of Robles' unlawful detention.
 
 
 81
 Peculiarly, the majority expresses concern with this straightforward reading of Robles, and is instead bent on adopting an interpretation of the decision that has already been rejected by this Circuit. In Jones v. Buchanan, we noted, "Rather than simply proving that the police acted unreasonably in violation of the Fourth Amendment, Robles had to prove that the police had violated the Due Process Clause," which required the application of "a far more rigorous standard than at issue" in a Fourth Amendment consideration. 325 F.3d at 535 n. 8. We further explained that the due process burden "is a difficult burden for any plaintiff, but particularly so for Robles since he conceded that no one bothered him during the 10-minute ordeal, admitted that he suffered no physical injury, and offered no objective evidence (e.g., lost wages or medical testimony) to support his claim of psychological injury." Id. at 535 n. 8. The Jones Court found these distinctions to be dispositive, and accordingly held, notwithstanding our decision in Robles, that officers are not entitled to qualified immunity when they knock an intoxicated individual to the floor, "jump[ ] on him, crushing his nose and lips, and bruising his ribs," when that individual is "unarmed, locked in a room by himself, and handcuffed with his wrists behind his back." Id. at 531.
 
 
 82
 Judge Luttig authored a dissent in Jones, which the majority of that panel found to be "as puzzling as it is unpersuasive." Id. at 535 n. 8. In the face of what is now Circuit precedent, Judge Luttig continues to press this same, discarded understanding of Robles, positing, "The Robles court clearly relied only on the absence of factually similar legal authority" in ruling that the due process violation at issue in that case was not clearly established. Ante, at 210. Essentially, the majority reads Robles as standing for the proposition that, unless a plaintiff can point to a case directly on point, the officers in question will be entitled to qualified immunity. The majority's interpretation of Robles, however, was rejected not only by the Jones Court, but also by the Robles Court itself. While an officer must be given notice that his unlawful actions may also be unconstitutional, "notice does not require that the `very action in question has previously been held unlawful....'" Robles, 302 F.3d at 270 (quoting Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).
 
 
 83
 Even more, the Supreme Court has clarified that "officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in [United States v.] Lanier, [520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)], [the Supreme Court] expressly rejected a requirement that previous cases be `fundamentally similar.'" Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). See also Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (holding, "For a constitutional right to be clearly established, its contours `must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful....'") (internal citations omitted).
 
 
 84
 As the majority would have it, because the officers in Robles were found to be entitled to qualified immunity after "binding a man to a pole in the middle of a deserted parking lot at three in the morning and abandoning him all for no legitimate law enforcement purpose," ante, at 212, then every officer in this Circuit will always be entitled to qualified immunity, regardless of the factual circumstances of his or her individual case, and regardless of differing constitutional standards (Fourth Amendment seizure versus Fourteenth Amendment due process violation). This unduly harsh and untempered standard is contradicted by the actual text of the Robles opinion. Much to the majority's apparent dissatisfaction, the Robles Court emphasized the importance of the de minimis calculation to its holding, noting that "for Robles' [due process] rights to have been violated by this arbitrary and purposeless act, he needs to have suffered more than a de minimis injury." Robles, 302 F.3d at 270. Although Robles met this burden in proving that the injury he suffered was more than de minimis, he failed to convince the Court that the resulting constitutional violation was clearly established.
 
 
 85
 The majority's insistence that the Robles Court "clearly relied only on the absence of factually similar legal authority" misses the point, ante, at 210, as that authority is factually dissimilar only because the substantial injuries suffered by the complainants in those cases were clearly more than de minimis. To establish a constitutional violation, Robles had to show: (1) that "the officers' actions amounted to punishment and were not merely `an incident of some other legitimate governmental purpose,'" and (2) that "the injury resulting from their actions was more than de minimis." Robles, 302 F.3d at 269 (internal citations omitted). In concluding that the constitutional violation was not clearly established, the Court observed that the cases cited by Robles were "inapposite" because "[t]hey involve[d] instances where detainees were subject to physical abuse or prolonged and inhumane conditions of detention." Id. at 271 (emphasis added). These distinguishing features relate solely to the second prong of the pretrial detainee/due process test: whether the injury suffered was more than de minimis. Thus, it necessarily follows that these cases were distinguishable because Robles' case presented the Court with a closer call on the de minimis inquiry. How else could the Court conclude that cases involving "physical abuse" were "inapposite"? As Judge Wilkinson, who authored the initial Robles opinion, later explained in a thoughtful and well-reasoned concurrence to the denial of rehearing en banc, "The panel ... concluded that Robles had offered sufficient evidence that he suffered more than de minimis injury, but that issue was close. After all, Robles was left alone for only 10 minutes, during which time no one bothered him. He concedes that he suffered no physical injury and that the officers told him that someone would pick him up there later." Robles v. Prince George's County, 308 F.3d 437, 438 (4th Cir.2002) (internal citations omitted).
 
 
 86
 Like the majority, I sympathize with Robles' plight. Yet regardless of how I might have decided the case, I cannot deny that the Robles Court placed strong emphasis on the lack of severe abuse. Had Robles been left handcuffed for twelve hours as opposed to ten minutes, there is no doubt that the case would have been resolved differently. See Robles, 302 F.3d at 271 (citing Putman v. Gerloff, 639 F.2d 415 (8th Cir.1981)). Frustrated by this fact, the majority ignores it. In so doing, the majority, not this dissent, adopts an interpretation of Robles that is revisionist. See ante, at 212.
 
 
 87
 Returning to the present case and the first step of the qualified immunity analysis, the plaintiffs have alleged that Officers Moxley and Perdue violated their Fourth Amendment rights to be free from unreasonable seizures by shooting and killing their family pets, when those pets presented no immediate danger and when nonlethal methods of capture would have been successful. The majority gives the plaintiffs' allegations (and the facts supporting them) little, if any, weight, and inexplicably concludes that "in every incident, the actions of Officers Moxley and Perdue were objectively reasonable." Ante, at 205. It is, of course, well established that we must take the facts in the light most favorable to the party asserting the injury. See Saucier, 533 U.S. at 201, 121 S.Ct. 2151. In Jones, for example, the defendant officer disputed Jones' assertion that his wrists were handcuffed behind his back, and instead suggested that "Jones may not be able to prove he was handcuffed." Jones, 325 F.3d at 529. This Court acknowledged that Jones might fail at trial to convince a jury of this fact, but held that, "in determining whether [the officer] is entitled to summary judgment, we must accept the facts in the light most favorable to Jones, and if Jones was handcuffed behind his back in a locked room, we find it hard to see how he would pose an immediate threat to anyone." Id.
 
 
 88
 Contrary to Jones and the relevant constitutional standard, the majority insists on viewing the facts in the light most favorable to the officers. For example, in the Wallace incident, the majority bases its finding of reasonableness on its assumption that "Moments after Moxley exited his truck, the animal attacked him." Ante, at 206. Viewing the evidence in the light most favorable to the plaintiffs, however, there is absolutely no way to conclude that Wallace's dog ever attacked Moxley. Moxley admitted that, upon arriving at the scene, he immediately drew his shotgun instead of considering less drastic options, such as using a catch pole. Moxley then walked toward the back of his truck, at which point he claims, "Before I reached the back of the truck, the dog comes around ... growling and showing teeth and charges right at me. I raised my shotgun up, and I shot him at the back of the truck." (J.A. at 403.)
 
 
 89
 While Moxley was the only eyewitness to this account, this Court is not required to accept, much less embellish upon, his version of events. As explained below, the physical evidence included a trail of blood running from a hole in the fence around Wallace's yard to the road where Moxley's truck was parked. If Moxley's account were accurate, the only possible explanation for the trail of blood would be that Moxley decided to parade the dog's body around the neighborhood by first dragging the carcass from the point "at the back of his truck" where the dog was shot over to the hole in Wallace's fence, and then back from the fence to the road and into the truck. The more logical and likely conclusion, of course, is that the dog was cowering in the hole in the fence, presenting no immediate threat to Moxley (or anyone else for that matter) at the time the dog was shot. Taking the factual evidence in the light most favorable to the plaintiffs, we must view Moxley's account with great suspicion, particularly when, as discussed below, Moxley has a documented history of fabricating reports to justify his actions.
 
 
 90
 Similarly, as regards the Altman incident, the majority finds Moxley's actions to be reasonable because Moxley made a "split second" decision to remove a potential danger "from the public streets." Ante, at 206. Again, this conclusion is contradicted by the evidence before this Court. According to Terry Evans, a witness on the scene, Officer Moxley fired at the dog while the dog was "probably fifty to seventy-five yards from him, at least," running away from Moxley down a narrow alley way, in between two houses. (J.A. at 293.) Moxley fired three times, wounding the dog with the third shot. At this point, Moxley called to a bystander on the street to go into Moxley's truck to grab a few extra shotgun shells. Approximately six minutes transpired from the time that Moxley asked for the shells to the time that the bystander retrieved the ammunition and delivered it to Moxley. Moxley then reloaded and killed the dog. By asking unknown civilians to go into his truck and search for ammunition, and by discharging his shotgun in an urban area while standing more than 150 feet from his target, Moxley made it clear that removing a potential danger from the public streets was the last thing on his mind. If anything, it is clear that the decision to shoot was made in spite of the fact that it would dramatically increase the danger to the public. Thus, for these reasons, as well as for the reasons stated below, I respectfully dissent from the majority's finding of reasonableness.
 
 
 91
 According to the City of High Point Police Department's rules, "Non-sworn personnel shall not carry firearms in the performance of their duties." H.P. Police Department, General Order No. 3.13 (emphasis in the original). Animal control officers ("ACOs") were not sworn police officers at the time of these shootings, and thus were not generally permitted to carry firearms.[1] For officers who are permitted to carry firearms, the regulations state, "Officers are not to discharge a firearm... when acting negligently or with wanton disregard for public safety ... or through carelessness or recklessness." Id.
 
 
 92
 Despite the fact that ACOs are not sworn officers, the Police Department's regulations do anticipate the potential use of deadly force by ACOs. The regulations outline the following procedures for the "Capture of [a] dangerous animal" by an ACO:
 
 
 93
 a) Owner to be contacted and assume responsibility for the control of the animal;
 
 
 94
 b) Traps may be set, or
 
 
 95
 c) Use of catch poles, or
 
 
 96
 d) Stun baton, or
 
 
 97
 e) Tranquilizer gun.
 
 
 98
 f) Firearm only as a last resort (in the event of immediate danger to the officer, another person, or animal).
 
 
 99
 H.P. Police Department, General Order No. 3.3. When firearm use is necessary, the regulations state that an ACO should first "[e]nsure the safety of all citizens, property, and other animals and out of public view if possible." Id. Furthermore, the ACO should only "[s]hoot the animal from close range (5 to 15 feet, if possible)." Id. Lastly, "Dangerous dog" is defined in § 12-2-17 of the High Point City Code as:
 
 
 100
 A dog that: 1. Without provocation has killed or inflicted severe injury on a person; or 2. Is determined pursuant to this section to be potentially dangerous because the dog has engaged in one (1) or more of the listed behaviors in subdivision (2) of this subsection.
 
 
 101
 Subdivision (2) states, in part, that a "potentially dangerous dog" is a dog that has been determined to have "[i]nflicted a bite on a person that resulted in broken bones or disfiguring lacerations or required cosmetic surgery or hospitalization" or a dog that has "approached a person when not on the owner's property in a vicious or terrorizing manner in an apparent attitude of attack...." H.P. Ordinance § 12-2-17.
 
 
 102
 As the majority recognizes, mere violation of these ordinances and regulations is not necessarily sufficient to prove the existence of a constitutional injury. See ante, at 209. As we stated in Robles, "not every instance of inappropriate behavior on the part of police rises to the level of a federal constitutional violation." 302 F.3d at 271 (emphasis in original). Flagrant disregard of these laws, however, is relevant from an evidentiary perspective to show that a reasonable officer confronting the same situations as the defendants would have acted differently. That is, in light of the above-cited regulations, one might expect the use of deadly force by an ACO to be an unusually rare occurrence.
 
 
 103
 Scott L. Allen, an experienced ACO, testified that after fifteen years in animal control, he was only aware of two instances in which deadly force was used. Officer Allen further explained that "deadly force should not be used in animal control activities unless absolutely necessary to save the life of the animal control officer or a bystander. There are many nonlethal tools at the disposal of the modern animal control officer including Chemical Capture devices such as tranquilizer guns, animal traps, as well as the catch-pole to name a few." (J.A. at 71.) Even more, Officer Marc LaRue Cutrell, who served as Moxley's and Perdue's supervisor, testified that both Moxley and Perdue should have been aware that the destruction of someone's dog could create a potential Fourth Amendment problem. (See J.A. at 237-38.)
 
 
 104
 In contrast to the reasonable approach outlined by Officer Allen, Moxley and Perdue adopted a more cavalier and reckless attitude towards animal control. Police Department statistics document, "From 1997 to 2000 ... Officers Moxley and Perdue discharged their departmentally issued tranquilizer guns or shotguns 101 times during the course of their duties." (J.A. at 94 (emphasis added).) That is, Moxley and Perdue were responsible for the discharge of a firearm approximately once every two weeks. Of course, dogs were not the only animals at which the defendants took aim. As the district court noted, "Their victims include[d] a racoon in a tree, a `vicious rooster,' and a `vicious cat.'" (J.A. at 510.)
 
 
 105
 Based on these statistics, one might begin to doubt the credibility of Moxley and Perdue when they assert that, in each of the specific incidents before this Court, deadly force was warranted. Our reluctance to accept the defendants' version of events would be augmented by the fact that not one of the dogs destroyed by the defendants in the present case would have been defined as a "dangerous dog" under the City of High Point's ordinances. H.P. Ordinance § 12-2-17(a). Moreover, none of the dogs would have been classified as a "potentially dangerous dog." H.P. Ordinance § 12-2-17(b). As such, it is hard to say how a reasonable officer would find it necessary to use deadly force to capture these dogs.
 
 
 106
 The officers' actions appear even more unreasonable when one remembers that, in each instance, they failed to contemplate the multitude of nonlethal methods available to them, despite the fact that the Police Department's regulations require an ACO to first consider five nonlethal measures for the "Capture of [a] dangerous animal." H.P. Police Department, General Order No. 3.3. The regulations further provided that if these five options are untenable, a firearm should be used "only as a last resort (in event of immediate danger to the officer, another person, or animal)." Id. (emphasis added).
 
 
 107
 In sum, viewing the evidence in the light most favorable to the plaintiffs, it is apparent that "the facts alleged show the officer[s'] conduct violated a constitutional right": to wit, the Fourth Amendment right to be free from unreasonable seizures. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Accordingly, I would join the Third, Eighth, and Ninth Circuits in holding that an officer commits an unreasonable, warrantless seizure of property, in violation of the U.S. Constitution, when he shoots and kills an individual's family pet when that pet presented no danger and when nonlethal methods of capture would have been successful. See Brown v. Muhlenberg Township, 269 F.3d 205, 210-11 (3rd Cir.2001); Lesher v. Reed, 12 F.3d 148, 150-51 (8th Cir.1994); Fuller v. Vines, 36 F.3d 65, 68 (9th Cir.1994).
 
 B.
 
 108
 Having resolved this threshold issue, the question becomes whether the right was clearly established. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. To answer this question, a court must engage in "a more particularized, and hence more relevant" inquiry. Id. at 202, 121 S.Ct. 2151 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202, 121 S.Ct. 2151. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal citations omitted). See also Robles, 302 F.3d at 271 (holding that a reasonable officer could not have been expected to anticipate that ten to fifteen minutes of unauthorized detention would amount to a greater than de minimis injury). Lastly, the qualified immunity analysis is not dependent "on the subjective beliefs of the particular officers at the scene, but instead on what a hypothetical, reasonable officer would have understood under those circumstances." Figg v. Schroeder, 312 F.3d 625, 635-36 (4th Cir.2002).
 
 
 109
 Although the majority does not reach the second step of the qualified immunity test, its review of the facts suggests it would not find any constitutional violation to be clearly established. The Court, however, fails to view those facts in the light most favorable to the plaintiffs. In particular, the majority relies on the accounts proffered by Moxley and Perdue, who were less than credible to say the least. Indeed, Officer Moxley often modified his official reports so as to ensure a finding of compliance by the City of High Point Police Department. According to an internal department report on an unrelated incident, "[I]nconsistencies... indicate a reasonable probability of untruthfulness regarding ACO Moxley's oral interview." (Br. of Appellee, at 5.) Similar problems characterize some of ACO Perdue's accounts.[2] Skepticism of Moxley's and Perdue's accounts is particularly warranted in the specific incidents before this Court, because, as explained below, it seems unlikely that the officers were motivated out of an earnest desire to safeguard the public. The majority correctly notes that the qualified immunity test is an objective one, and that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." Ante, at 213 (quoting Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In this case, however, the officers' evil intents are relevant, not from a constitutional perspective, but for a credibility determination. Knowing the officers' history of deceit and ill-motive, we should be less willing to blindly accept their assertions that, in each of the cases, the dogs were dangerous and that the threats were imminent. Rather, viewing the facts in the light most favorable to the plaintiffs, we might conclude that, the officers' assertions notwithstanding, the dogs were nonthreatening. See, e.g., Jones, 325 F.3d at 528 (noting that although the officer "maintains that he did perceive such a threat ... Jones can point to evidence which suggests either that [the officer] is not credible on this point or that the deputy's perception of a threat was not objectively reasonable"). Therefore, upon engaging in the second stage of the qualified immunity analysis, it will be necessary to review some of the factual details overlooked by the majority.
 
 
 110
 The Larsen Incident. The first event involved the shooting of Heidi, a purebred Rottweiler owned by Kimberly Larsen. The plaintiffs allege that Heidi had been professionally trained by Visha K-9 Specialists, who "opined that Heidi sought anyone's affection, showed no signs of aggressive or anti-social behavior, and was very humble and somewhat shy." (J.A. at 22.) The plaintiffs support this allegation by noting that Heidi was certified as both a therapy dog and as a "Canine Good Citizen" by the American Kennel Club.
 
 
 111
 In responding to the call on January 10, 1997, Officer Perdue did not make any attempt to contact Heidi's owners. Instead, he pulled into the Larsens' driveway and exited the vehicle with his shotgun. According to an eyewitness, Charles Elkins, Heidi jumped up from the driveway to a slightly elevated yard, but was not behaving aggressively. (J.A. at 257-58.) Elkins explained that "[t]he dog was standing nearly still at the moment that it was shot. The dog appeared to be just undecided about what was happening and what to do about it." (J.A. at 256-57.) As the dog was walking away from him, Perdue fired, striking Heidi in her hindquarters.
 
 
 112
 Perdue explained his decision to shoot by stating, "I would get out the shotgun. I have done this numerous times. If the dog shows me he's not aggressive and he's not going to attack me, that's fine. I can always put the shotgun up and go get the catch pole." (J.A. at 428.) Perdue's standard operating procedure, however, directly contradicts the City's regulations, which require an officer to first: (1) contact an owner; (2) set a trap; (3) use a catch pole; (4) use a stun baton; or (5) use a tranquilizer gun. H.P. Police Department, General Order No. 3.3. These options must be considered before an ACO shoulders a shotgun. Id. In sum, considering the evidence in the light most favorable to the plaintiffs, I would conclude that Perdue did not shoot Heidi because of any real or perceived danger.
 
 
 113
 The Frye Incident. The second incident occurred on February 7, 1997, and involved four, seven-month old Siberian Husky puppies owned by Wendy Frye: Sadie, Tut-Tut, Bandit, and Boo-Boo. Upon arriving at the scene, Officer Perdue immediately reached for his shotgun, as was his custom. When asked why he needed to use deadly force against Frye's dogs, Perdue responded, "If you hit one of [the dogs with a tranquilizer dart] you're just wasting your time. He's going to run off, and he's going to come back, and you're going to have the same scenario all over again. And you're dealing with five dogs, so it would have been a waste of time." (J.A. at 421.) Similarly, Frye's fiance, Joe Scroggs, was told by Police Department officials that the puppies were shot, not because they posed any danger to anyone, but because "we weren't going to spend all day chasing them." (J.A. at 121.) Needless to say, effecting a warrantless seizure is not defensible on the grounds that it was faster and easier than following established, less intrusive procedures.
 
 
 114
 The majority concludes, "In retrospect, it may have been preferable if the officers attempted first to use nonlethal force in every instance. Such nonlethal force may have been successful, but, tellingly, it may not have been." Ante, at 207. As to the Frye shooting, however, we know conclusively that nonlethal force would have been successful. As mentioned above, the dogs were so small that Frye was able to "grab[ ] [Boo-Boo] up and pick[ ] him up," just as Perdue was preparing to fire at him. (J.A. at 423.) Furthermore, even if Perdue perceived the dogs to be a threat, no reasonable officer, and certainly no reasonable animal control officer who handles loose and at-large dogs on a daily basis, could view Frye's fifteen pound puppies as dangerous.
 
 
 115
 The Wallace Incident. The third incident involved a Golden Retriever/Labrador mixed-breed named Sundance, owned by Gilbert Wallace. While there were no other eyewitness other than Officer Moxley, physical evidence included a trail of blood leading from a hole in the fence to the road and several empty shotgun casings. The only logical inference to be drawn from this evidence is that Sundance was in the hole at the time he was shot, and was attempting either to crawl into or out of Wallace's yard. In either case, it would have been impossible for Sundance to charge Moxley at the time of the shooting.
 
 
 116
 Moreover, Moxley concedes that he ignored Police Department policy in deciding when to use a firearm. For example, when asked why he shot Wallace's dog, Officer Moxley explained, "I could not allow the dog to escape since the [human] victim would have to start rabies shots in three days." (J.A. at 406.) When asked if there was "any written rule anywhere" that would support this policy, Officer Moxley responded, "No. That's my rule, I guess. I'm not going to allow a dog to escape that's bitten someone and we don't have an owner for." (J.A. at 406.)
 
 
 117
 The Altman Incident. The final incident involved Hot Rod, a pit-bull mix owned by Robert and Ann Altman. On March 24, 2000, Officer Moxley responded to a 911 call about a loose dog. When Moxley arrived at the scene, Hot Rod "took off" down the alley. Moxley exited his truck with his shotgun. Without pausing to interview Evans or Hendricks, or to inquire as to who the owner of the dog might be, Moxley immediately gave chase. Moxley made no attempt to capture Hot Rod through any of the nonlethal means that were readily available to him. Although Police Department regulations state that officers should only discharge their firearm when they are within close range of an animal (5 to 15 feet), Moxley began firing from a distance of approximately 150 to 225 feet. After three shots, Moxley hit Hot Rod. According to Terry Evans, the individual who placed the 911 call, Hot Rod was running away from Moxley at the time of the shooting. Evans explained, "The dog never lunged towards him, I can tell you that. I mean, the guy got out of his truck and the dog was running. I never seen the dog come at the officer at all." (J.A. at 300.) Again, without considering any of the nonlethal options available to him, Moxley chose to shoot a dog that presented no immediate danger.
 
 
 118
 With the facts of each incident fully summarized, it is now necessary to determine whether the unconstitutionality of each of these unreasonable, warrantless seizures was "clearly established" at the time of the incidents. See Figg v. Schroeder, 312 F.3d at 635-36. The Supreme Court made it clear more than a decade ago that an individual's personal property is an "effect" for purposes of Fourth Amendment analysis. See Soldal v. Cook County, 506 U.S. 56, 62, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (holding that "our cases unmistakably hold that the [Fourth] Amendment protects property as well as privacy"). As the majority observes, the State of North Carolina has recognized an individual's property interest in his dog at least since 1838. See Dodson v. Mock, 20 N.C. 282. In short, the majority's extensive and thorough analysis demonstrates that it has long been "clearly established" that dogs are "effects" for the purposes of Fourth Amendment analysis, and an individual has the right to be free from the unconstitutional seizure of his dog. See ante, at 200-204.
 
 
 119
 "A `seizure' of property occurs where there is some meaningful interference with an individual's possessory interests in that property." Soldal, 506 U.S. at 63, 113 S.Ct. 538 (quoting United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). Plainly, it would be a waste of words to inquire into whether the complete and irremediable destruction of an individual's property affects a "meaningful interference" with a person's right to the use, possession, and enjoyment of that property. When officers kill a dog, they have undoubtedly "seized" it from its owner.
 
 
 120
 The only unresolved question, therefore, is whether the unreasonableness of the seizures in the present case would have been sufficiently apparent to the officers to put them on notice that their actions were unconstitutional. "In determining whether a right is clearly established, we may rely upon cases of controlling authority in the jurisdiction in question, or a `consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" Rogers v. Pendleton, 249 F.3d 279, 287 (4th Cir.2001) (quoting Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).
 
 
 121
 While there is no Supreme Court or Fourth Circuit case directly on point, each of the three circuits to have considered whether an individual has a constitutional right to be free from the unreasonable destruction of his or her dog has found that right to be clearly established. See Brown v. Muhlenberg Township, 269 F.3d 205, 211 (3rd Cir.2001); Lesher v. Reed, 12 F.3d 148, 151 (8th Cir.1994) (holding that a dog that was destroyed by the police department was "obviously ... `seized' within the meaning of the Fourth Amendment"); Fuller v. Vines (Fuller I), 36 F.3d 65, 68 (9th Cir.1994) (noting that "[t]he killing of the [plaintiff's] dog is a destruction recognized as a seizure under the Fourth Amendment"); Fuller v. Vines (Fuller II), No. 96-15842, 1997 WL 377162, at * 1 (9th Cir. July 7, 1997) (unpublished) (finding that "it was apparent in light of preexisting law that shooting and killing a dog constituted a seizure within the meaning of the Fourth Amendment," and was thus a clearly established constitutional right).
 
 
 122
 In particular, the Third Circuit has had occasion to delve into the "unreasonableness" aspect of this inquiry. Although Brown v. Muhlenberg Township had not been decided at the time of the four events at issue here, "a right can be deemed clearly established even if there is no prior decision addressing the precise conduct at issue, so long as its illegality would have been evident to a reasonable officer based on existing caselaw." Rogers, 249 F.3d at 285-86. I find the reasoning of the Third Circuit persuasive on this point, and would conclude, as that circuit has, that the constitutional right at issue was clearly established.
 
 
 123
 In Brown, the court considered the case of "Immi," an unregistered three-year old Rottweiler running at large and unrestrained. 269 F.3d at 208-09. After surveying the scene, an officer slowly approached Immi and drew his gun. At this point, Immi's owner ran outside, and from a distance of approximately fifty feet, called for the officer not to shoot. The owner was too late, however, and the officer fired several times, killing the dog. Id. The court concluded that while "the state's interest in protecting life and property may be implicated when there is reason to believe that the pet [to be killed] poses an imminent danger, ... [t]his does not mean... that the state may, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on...." Id. at 210-11.
 
 
 124
 While the facts of the present case are not directly on point with Brown, several similarities are noteworthy. For example, like the Larsen incident, which involved a Rottweiler, and the Altman incident, involving a pit bull mix, the Brown case regarded a breed of dog generally considered to be dangerous. Despite the inherent dangerousness of the breed, however, the Third Circuit found the unconstitutionality of the officer's actions to be clearly established. (The seizure of Wendy Frye's Siberian Husky puppies, and the seizure of Gilbert Wallace's Golden Retriever/Labrador Retriever mix appear even more unreasonable, considering the generally accepted friendliness of these breeds.)
 
 
 125
 While the Third Circuit noted that the owner of Immi was present and "obviously desirous of retaining custody," Brown, 269 F.3d at 211, there are facts in each of the instances before this Court that accentuate the unreasonableness of the seizures. In attempting to kill Altman's dog, for example, Officer Moxley discharged his shotgun in a densely-developed urban neighborhood from a distance of 225 feet, while the dog was running away from him and clearly presenting no imminent or immediate danger to anyone. Similarly, the evidence in both the Larsen and Wallace incidents strongly suggests that the dogs were not threatening anyone, and in fact, may have been cowering submissively. As for the puppies in the Frye incident, they were so small that Wendy Frye was able to rush out of her house and pick up the last surviving dog in her arms. Rather than firing because of any perceived danger, Officer Perdue apparently acted because "we weren't going to spend all day chasing" the Frye puppies. (J.A. at 421.) Each of these facts take on additional importance when it is remembered that, according to their supervisor, both Officers Moxley and Perdue should have been aware that the destruction of an individual's dog in the absence of any imminent threat of harm might raise the possibility of a Fourth Amendment violation. (J.A. at 237-38.)
 
 
 126
 Although the Third Circuit did place some emphasis on the presence of the owner, there are other facts in the instant cases that make it apparent that the constitutional rights at issue were clearly established. Moxley and Perdue insisted on disregarding local law by firing buckshot throughout the City's neighborhoods, and as a result, they killed several nondangerous and nonthreatening dogs owned by the plaintiffs as family pets. Viewing the facts in the light most favorable to the plaintiffs, it is clear that the officers carried out these warrantless seizures without any concern for the public's safety. As a result, Moxley and Perdue must be expected to know that their shooting spree was unconstitutionally unreasonable.
 
 III.
 
 127
 In sum, I would find that: (1) Officers Moxley and Perdue violated the Plaintiffs' constitutional rights by effecting several unreasonable, warrantless seizures; and (2) those constitutional rights were clearly established. I am most concerned, however, with the majority's conclusion that the actions of Moxley and Perdue were somehow constitutionally reasonable. The majority is able to reach this finding only by ignoring some evidence (such as the trail of blood beginning at the fence around Wallace's yard) and refusing to consider the remaining facts in the light most favorable to the nonmovants. In taking this view of the Plaintiffs' evidence, the majority has obfuscated this Circuit's qualified immunity analysis by effectively replacing the Supreme Court's well-defined, two-part test, see Saucier, 533 U.S. at 201, 121 S.Ct. 2151, with an unsupportable single-step approach.
 
 
 128
 For the foregoing reasons, I respectfully concur in part and dissent in part from the judgment of the majority.
 
 
 
 Notes:
 
 
 [1]
 The City of High Point Police Department has since amended its regulations and now permits ACOs to carry firearms
 
 
 [2]
 As to the Frye shooting, for example, Perdue testified that each of Frye's animals were large dogs, weighing forty-five to fifty pounds each, and that together they formed a menacing and dangerous pack. In actuality, the puppies weighed only fifteen to twenty pounds apiece. Furthermore, Perdue effectively conceded that he exaggerated the severity of the threat when he testified that, as he was taking deadly aim at Boo-Boo, Frye stepped out of her home and scooped the dog up in her arms